STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. CHARLES A. BARTS, PLAINTIFF IN ERROR.

Argued May 2, 1944—Decided August 23, 1944.

Before Brogan, Chief Justice, and Justices Donges and Perskie.

For the defendant in error, *William A. Wachenfeld,* Prosecutor of the Pleas; *Jerome B. Litvak,* Second Assistant Prosecutor; *C. William Caruso,* Special Assistant Prosecutor.

For the plaintiff in error, *Isidor Kalisch* and *Oliver Randolph* (*Isidor Kalisch,* of counsel).

The opinion of the court was delivered by

Brogan, Chief Justice. The plaintiff in error, Charles A. Barts, stands convicted of extortion. The statute (*R. S.* 2:127–1) within which the indictment was laid provides: "Any judge. magistrate, sheriff, coroner, constable, jailer or other officer who shall, by color of his office, receive or take

any fee or reward whatsoever not allowed by law, for doing his office, shall be guilty of a misdemeanor." Barts was a detective, denominated first-class, in the police department of the City of New York.

The indictment is in two counts, the first charging that Barts, being a police officer of the City of New York, unlawfully and corruptly did receive and take, by color of his office, the sum of $1,000, not allowed by the laws of the State of New Jersey for doing his office, contrary to the statute, &c. The second count is identical with the first save that it charges that Barts, as such officer, &c., received and took a "reward."

The facts and circumstances offered in proof by the state to support the allegations of the indictment are: that one Marion Greenberg, aided and abetted by a woman companion, invited an unnamed man to an apartment in New York which the two women maintained for purposes of prostitution; that the Greenberg girl stole a small package as well as the wallet of the victim; that the package contained $10,000 in cash. Marion Greenberg had another residence in uptown New York, in the Harlem district, where she remained from time to time, according to her convenience, with two couples, Mr. and Mrs. John and Mr. and Mrs. Beale. John is a negro, his wife a white woman; the Beales are both negroes. Marion Greenberg is a white woman and lived at the Harlem apartment on occasions with one Joseph Waters, a negro, whose permanent residence is in Essex County, Newark, New Jersey. After the theft, which took place in the apartment maintained by her and her woman companion, Marion Greenberg left and went to the uptown abode. She telephoned for Waters, who was in Newark at the time. He reached the Harlem apartment at about three o'clock in the morning and she turned the $10,000 over to him. Waters gave $700 of the money to Beale and John before leaving their residence "to keep them quiet." The following day the Greenberg girl took quarters in a New York hotel under an assumed name. These events took place some time in the month of February, 1943.

It is important to note that prior to the larceny in New York Marion Greenberg, charged with a previous larceny

done at Newark, New Jersey, was there held to bail pending indictment and that she failed to appear to plead after the indictment, whereupon her bail was forfeited  On March 25th, a month after the larceny in New York, Marion Greenberg was in a tavern on West 116th Street, New York, with a male companion. The defendant, Barts, then attached to the Thirty-second Detective Squad on West 135th Street, came into the tavern and, in the course of conversation with the Greenberg girl, said that he had been informed "that she had clipped a man for $10,000." He told her, so she testified, that her victim had come to him because he "wanted the case disposed of quietly." At first she denied she stole the money. Thereupon Barts said that he knew her and that she was wanted for "jumping bail" in Newark, New Jersey, and that he would pick her up "under suspicion" until he found her "wanted" card. Thereupon she admitted having stolen the money but said that only $5,000 had been taken; that she had spent $3,000 of it and therefore "could only give him $1,000 because I wasn't going to give him all I had left." She also told Barts that Waters had the money; that he was in Newark and that if Barts wanted money he would have to go to Newark with her and get it from Waters. As a result of all this Barts and Marion Greenberg took a taxicab to Newark. They left New York between half past four and five o'clock in the afternoon of March 25th. Arriving at Newark they sought Waters at various places. He was finally located in a tavern and he joined them. When he did the Greenberg girl informed Waters "of Detective Barts' request." She communicated this information to Waters privately and not in the range of Barts' hearing. Thereafter, according to her testimony, Barts and Waters conferred outside the range of hearing of the witness. It was then about seven o'clock in the evening. At this juncture all three got into the New York cab, which had been kept waiting, and drove to the home of one Sophie Brown on Livingston Street, Newark, New Jersey. En route Waters is said to have told Barts "that he was giving him that money [$1,000] to keep me [Marion Greenberg] out of jail," and Barts replied that the girl "wouldn't go to jail." When the cab reached the Living-

ston Street address Waters left the cab and went into the house. On his return the two men, Barts and Waters, entered a nearby tavern, the girl remaining in the cab. After some delay Waters and Barts reappeared and the witness, Greenberg, testified that Waters said to the defendant, "Here's a thousand dollars in ten one hundred dollar bills." Before turning over the money Waters demanded some identification, whereupon the defendant showed him an "orange card" on which his name was printed. Prior to showing him the card he had displayed his police badge. It seems that the orange colored card was one which was issued as a pass by the Fifth Avenue Coach Company to members of the New York police department. Satisfied with the identification, Waters handed Barts the money, saying that it was a thousand dollars and that it was intended to "keep this girl out of jail." At the request of the girl, Barts asked Waters to return to New York with them. Waters did so insisting, however, that his brother, "Emzey," accompany them. The four went to New York in the cab. During the journey the Greenberg girl testified that Barts had told her that his information about the theft of $10,000 came from Beale, in whose New York apartment she lived from time to time with Waters; that Beale had pointed out the Greenberg girl to Barts.

The facts as they appear from the State's witnesses have been stated in detail, the necessity for which will presently appear. The defense offered was a denial of the fact and certain testimony to support an alibi.

Barts on this appeal presents many assignments of error and specifications of causes for reversal. Error is assigned in the bill of exceptions and the entire record is before us for consideration as to whether the defendant suffered manifest wrong or injury during the course of the trial in the court's rulings on evidence and the charge to the jury. R. S. 2 :195–16.

It is first argued that the court erred in refusing to quash the indictment; in rejecting a motion in arrest of judgment; in overruling a motion for direction for the defendant; in certain of the rulings on matters of evidence; that the court's charge to the jury was legally erroneous as well as its refusal

to charge certain requests propounded by the defense. The court's refusal to quash the indictment is a matter of discretion and is not reviewable on strict writ of error. *State* v. *Siciliano,* 85 *N. J. L.* 389; *State* v. *Pisaniello,* 88 *Id.* 262; *State* v. *Bove,* 98 *Id.* 350; *State* v. *Berman,* 120 *Id.* 381; nor may it be argued under the general review invoked on this appeal for manifestly a motion to quash is not part of the proceeding had at the trial but always precedes it. *State* v. *Plough,* 88 *Id.* 428, 430. While the general review statute, *supra,* empowers the appellate court to review rulings of the trial court which are discretionary in their nature, it does not embrace such rulings as occur prior to the actual trial, *e. g.,* a motion to quash. Compare *State* v. *Pisaniello, supra.*

The same points to which the court's attention was directed on the motion to quash were likewise raised in support of the defendant's motion in arrest of judgment, motion for a direction of acquittal and by implication in two of the requests to charge (Nos. 9 and 10). Generally, the argument was that the indictment did not state a criminal offense and that the State's proof did not make out a *prima facie* case. These were law questions for the court (*State* v. *Bacheller,* 89 *N. J. L.* 433; *State* v. *Berman, supra*) in that they amounted to a challenge to the indictment and the proof.

The two requests to charge—it is not necessary to quote them *in extenso*—are based on the proposition that since Barts had no office which he could legally exercise within this state, and since he had neither official position in this state nor official duty to perform here as a police officer from another state, then even though he received the money, as charged, he could not as a matter of law be found guilty of extortion. This was also the gist of the argument attacking the indictment.

Extortion, in a comprehensive sense, signifies any oppression under color of right. *Russell on Crimes* 305. In the strict sense it signifies the unlawful taking by any officer, by color of his office, of any money or thing of value that is not due to him, or more than is due, or before it is due. *Jones' Blackstone,* Book 4, ch. 10, *p.* 2324, § 153.

The main argument under the first point seems to us to be that the indictment is defective because it was not the intendment of the legislature, when the statute, *supra,* was enacted, to include as potential offenders officers from another state, as was this defendant; and that the indictment was also invalid because it failed to set forth the service for which the fee was exacted as well as the person from whom the money was received, relying for the latter point on the case of *State* v. *Maires, 33 N. J. L.* 142. And, further, that our law requires that the identity of the person from whom the money is extorted be disclosed in the indictment.

A ready and as we think a complete answer to these contentions seems to be, first, that the indictment is cast in the exact words of the statute. This is sufficient in the matter, as here, of a statutory crime. *State* v. *Thatcher, 35 N. J. L.* 445; *State* v. *Halstead, 39 Id.* 410; *State* v. *Brand, 76 Id.* 267; *affirmed, 77 Id.* 486; *State* v. *Morris, 98 Id.* 621. It is conceded that Barts was an officer in the State of New York and that he had no official standing in this state. But the statute does not make any differentiation or distinction in this respect. It is true that the prohibition against an officer receiving or taking fees or rewards to which he is not entitled was formerly restricted to officers "of this state" under the criminal statute as it was cast in the Revision of 1874. In the twenty-third section of the statute as then written there appeared such limitation (General Statutes of New Jersey, 1709-1895, Vol. I, page 1053), but the enactment of the Crimes Act of 1898, entailing as it did a recasting of this statute (now *R. S.* 2:127—1) eliminated the restriction, &c., "of this state" and made the act general.

The rule of construction is that when a later statute omits words, particularly of limitation, included previously in the law, such omission is meaningful and was done with the full knowledge and approval of its effect (compare *Alexander* v. *Cunningham Roofing Co., Inc.,* 124 *N. J. L.* 390, 394). We think therefore the statute comprehends officers from another state, as in this case, and that the learned trial judge was right in overruling this challenge to the indictment, grounded on the fact that Barts, the defendant, was an officer from

another state. Nor do we think that it was necessary to set forth in the indictment the fact that no fee or reward of any kind was due to Barts and our understanding of the law in this regard is not at all at variance with the case cited by the plaintiff in error as authority for the contrary rule, to wit, *State* v. *Maires, supra.* In that case Chief Justice Beasley said: "All that is necessary is, that the fact should be shown to the court. Thus, in a case where, by force of a general statute, an officer is entitled to no fee for a particular service, or to a fee, the amount of which is unchangeably prescribed, it could not, I think, be successfully contended that the pleading must aver, with regard to the first class, the absence of a right to any fee; and in the other, that the sum exacted exceeded the legal limit. Neither of such allegations could add anything, either by way of force or perspicuity, to the legal charge, because, where an official act is performed in subordination to the directions of a public statute, or the provisions of the general law, the court must take notice, *ex officio,* of the rights of the officers and the extent of such rights."

Here Barts had no right whatever to accept any fee or reward, whichever it may be called. Since we entertain this view of the law, it is unnecessary to discuss the requests to charge proffered by the defendant, which have been alluded to above, because from what we have said it follows that these requests to charge, based as they were on the theory of the immunity of Barts from conviction of extortion because he was not a New Jersey officer, were properly rejected by the trial court.

It is next said the court erred in denying defendant's motion for directed verdict at the close of the state's case. In arguing this point counsel, with great care, goes into an extensive resume and analysis of the evidence, pointing out, among other things, that no notification was given to the New York police authorities until April 6th, 1943, that Marion Greenberg was wanted in New Jersey for having failed to appear to plead to an indictment after which her bail was forfeited and that as a matter of fact she was not arrested by an officer of New Jersey until April 14th, 1943, by virtue

of a bench warrant. Implied in this argument therefore is the proposition that Barts could not have arrested her in New York as a fugitive from justice because he had no knowledge of that fact. In all of this, however, the circumstance that the Greenberg woman had committed a larceny of $10,000 in New York was overlooked. This information, the evidence discloses, had been imparted to Barts by Beale, the man in whose Harlem apartment the Greenberg girl lived from time to time with Waters. Marion Greenberg had confided in the women who occupied this apartment that she had stolen this money and they in turn told their husbands. Both men, according to the testimony, reported the fact to Barts. There was no testimony that Barts, by official notice out of the New York police department, knew that the Greenberg girl was "wanted" in Newark for "jumping bail" but the girl testified that Barts said to her "he would pick me up under suspicion of being found in a colored apartment and turn me over to Newark when he found my wanted card." The balance of the argument seems to be that Barts was not acting in any official capacity and therefore could not have made an arrest in New Jersey, all of which is conceded by the state and requires no mention because of what has been said heretofore. However, so far as the court's refusal to direct an acquittal is challenged under this point, the evidence was such at the end of the state's case that a *prima facie* case had been made out. The Greenberg girl had told her story in all its sordid detail. The orange card, so called, a pass issued by the Fifth Avenue Coach Company, had been placed in evidence. The defendant's immediate superior in the New York police department, Lieutenant Charles Malley, had testified that on the night of March 25th, Barts was absent and did not appear at the precinct until sometime in the neighborhood of ten o'clock. Emzey Waters, one of the brothers of Joe, had identified the defendant and stated that he had ridden back to New York with his brother and the defendant and Marion Greenberg in the taxicab. There was plenary proof that the defendant was a New York police officer and proof as well that he had received the money in question at Newark, New Jersey, on the strength of his status

as such officer. Bearing in mind that generically extortion is an abuse of public justice and a misuse by oppression of the power with which the law clothes a public officer, it is difficult to perceive a shred of merit in the argument that the trial court, at the end of the state's case, should have directed a verdict of acquittal.

It is next said the trial court erred in refusing to exclude two of the state's witnesses, Neidorf and Sklarey, both officers attached to the office of the Prosecutor of the Pleas, from the courtroom, pursuant to an order made by the court at the inception of the trial, based on a stipulation between counsel that all witnesses, both for the state and the defendant, be excluded and that it was further error, over the defendant's objection, to permit Lieutenant Malley of New York to remain in the courtroom during the testimony of the defendant, Barts. It is the fact that as the trial was about to open the prosecuting attorney requested the court to exclude all witnesses from the courtroom except the one called to the stand. Counsel for the defense agreed thereto. The court, in permitting the individuals named to be exceptions to the rule, said that "the design" of his judgment was to see to it that no witness would be influenced or instructed by any other. He then pointed out that Lieutenant Sklarey was an officer of the court as well as of the prosecutor's office and that he was an exception as was Neidorf. The same principle applied in the case of Lieutenant Malley of New York. The officers first mentioned had aided the state as was their duty in investigating the matter prior to the indictment of the defendant. In the case of Lieutenant Malley, permitting him to remain in the court during the trial was no abuse of discretion. No harm or injustice was visited on the defendant by the presence of any of those officers. No serious claim is made that there was; and in any event the matter is one peculiarly for the sound discretion of the trial judge. The pertinent rule is stated thus: "The question as to what witnesses may be exempted is largely a matter within the discretion of the court, and, even after the granting of the rule or order excluding or sequestering the witnesses, it is within the discretion of the trial court to permit some of them to remain in the

courtroom and afterward to testify if the circumstances require it. Accordingly it is within the sound discretion of the court to permit a limited number of witnesses to remain for the purpose of assisting the prosecution or accused." 23 *C. J. S.* 381, § 1011.

In this kind of criminal case the wisdom of excluding the lay witnesses generally is so apparent as to require no discussion of the point, and it is obvious that it is a matter for the prudence and sound discretion of the trial court. The cases relied upon by plaintiff in error, *State* v. *O'Leary,* 110 *N. J. L.* 36, and *State* v. *Foulds,* 127 *Id.* 336, are not at variance with the view we entertain and have stated.

We take occasion here to examine certain of the assignments of error based on the court's rulings on evidence.

It is said by plaintiff in error under the fourth point in the brief that the trial court erred in overruling defendant's objection to a question put to the witness for the state, Lieutenant Sklarey. There is no merit to the argument. The question called for a "yes" or "no" answer. The inquiry was whether Sklarey had talked to Barts. The question was proper. Even were it otherwise the point is unavailing as no reason for the objection was stated. Compare *Lyon* v. *Fabricant,* 113 *N. J. L.* 62, 63. On review of the entire record, the omission to advance a reason for an objection is not necessarily fatal, but to support strict error an objection, standing alone, is of no avail. Many like assignments are argued in the brief of the plaintiff in error. These (listed under points 6, 16, 18, 20, 21, 22, 29, 32, 40, 44 and 45) are unavailing and on the same basis—no reason stated to support the objection—and this, even though an exception be noted, renders the exception valueless as an assignment of error.

It is also said the trial court erred in overruling the defendant's objection to certain remarks made by the prosecutor in his summation. There was no motion to strike out the matter now complained of or to instruct the jury to disregard it. Compare *State* v. *Terry,* 91 *N. J. L.* 539. Nor was there any reason advanced on the part of the defense to indicate wherein the remarks were prejudicial or objectionable in any way. Thus no ground for review was laid.

It is also argued (point 30) that the court erred in overruling defendant's objection to the method adopted by the state for the identification of Joseph Waters by the state's witness, Philip Lazarus, and to this it is sufficient to say that neither objection nor exception was entered.

It is further said (point 31) that certain testimony was admitted concerning what the defendant is alleged to have said to one Virginia Gill, the question addressed to the defendant on cross-examination being: "Didn't you tell Virginia Gill that she wouldn't have to wait for Lieutenant Sklarey?" The defendant answered that he did not so advise her. No proof was produced that he had so advised the person in question. The state did not produce Virginia Gill to contradict the defendant on this detail, according to its agreement to do so. The state's attorney asked to be excused from so doing, explaining that he expected the defense would consume more time than it did and that he was willing to rest the state's case at that juncture or would produce Miss Gill the following day. The court considered that there was nothing to rebut by producing her and absolved the state's attorney of his obligation to do so, to which no objection whatever was made by the defendant. We fail to see how, in the face of the acquiescence of the defendant in the action of the court, he can complain now that his legal rights suffered in any way.

It is also complained by the plaintiff in error that the court erred in sustaining the state's objection to certain questions asked of certain of the state's witnesses. As to the first (argued under point 7) it is sufficient to say that the information sought by the overruled question later was supplied by the same witness without objection. The court's rulings on the questions excluded on objections by the state were, in our view, correct. One evidence question, however, should be mentioned. The witness, Murphy, a member of the New York police department, called as a state's witness to testify concerning the defendant's absence from duty on the night in question when the state alleged he was in the City of Newark and not on duty in New York, testified contrary to previous information supplied by him to the state. The

prosecutor pleaded surprise, called the witness' attention unequivocally to his previous statements, at variance with his then testimony, and in that fashion was permitted to neutralize the testimony of the witness. The argument is that the court refused to permit the witness to testify to certain facts and circumstances which it is argued would tend to show that the witness was mistaken about the information which he gave antecedent to the trial and was correct in the testimony he offered at the trial. The argument has no merit. The court's ruling, in the main, in each instance amounted to a refusal to permit the witness to deneutralize or counteract the statements which he had made prior to being called to the witness stand and the rulings, in our view, were without legal fault.

It is next said it was error to have rejected defendant's motion for a mistrial advanced in the course of the proceedings. It appears that Lieutenant Sklarey, attached to the office of the Prosecutor of the Pleas of Essex County, went to New York and interrogated certain witnesses whom he first put on their oath, one Frank Fata and the other Vincent Murphy, a fellow detective of the defendant's. Now Sklarey in his status of a county detective may, under our law (*Pamph. L.* 1939, *ch.* 276, *p.* 697), administer an oath or affirmation provided it be done in relation to a matter involving a violation or an attempted violation of the criminal laws of this state. It is argued that Sklarey had no right whatever to administer an oath to the persons mentioned above in the State of New York, where he interrogated them, and that the jurors having heard these persons state at the trial that the information given by them to Sklarey in New York was under oath, and there being no authority for procuring a sworn statement in this particular manner by Sklarey, a New Jersey officer, were unduly impressed by the fact that the information, so obtained, had been under oath. We do not consider the point meritorious. The court stated that Sklarey had no authority to administer an oath in New York to persons there under interrogation. No harm can be said to have been visited on the defendant in any event. The testimony of Murphy had been neutralized. There was no

objection at all on this score when Fata was cross-examined and the court particularly and accurately instructed the jury on the matter.

It is said the court erred in sustaining the state's objection to a question put to several character witnesses relative to the defendant's reputation. The question was whether the witness knew the general reputation of the defendant "for fidelity and faithfulness in the performance of his police duties." The argument in support of the legitimacy of the question is that evidence should have been admitted regarding the defendant's particular reputation, considering the charge of which he stood accused. The state says it was rather the defendant's general honesty and integrity with relation to the crime of which he stood charged that was the norm for his examination. This question was asked of six witnesses—two police officers, two clergymen, a lawyer from New York and the last a lay person. In the ordinary course the last four would not know very much about defendant's fidelity to his duty as a police officer and no foundation was laid for the question so far as these witnesses were concerned. Obviously their personal opinion could not be the criterion but rather the general reputation in this particular and general reputation is arrived at from composite or general thought of the community in which the defendant lived or worked; that is the crux of the matter. *State* v. *Danser,* 116 *N. J. L.* 487, 492. Character inquiry, in the very nature of things, should be confined to the particular conduct involved in the criminal charge. Whether the defendant was faithful in his duties as a police officer of the City of New York was too narrow an issue. It follows that the court's ruling was right.

The right of a defendant to offer affirmative evidence of his reputation or qualities which would tend to show the unlikelihood of his having committed the offense with which he is charged should, for obvious reasons, be confined to those traits of character which would tend to negative the idea that he committed the crime with which he is charged. He comes before the court with no presumption on the score of reputation that it is either good or bad, except of course the presumption of innocence, until it be proved and determined by

a jury that he is guilty. These witnesses, however, were permitted to testify as to the reputation of the defendant in the community for honesty, decency and morality, which went more to the issue than did his reputation for faithfulness in the performance of his police duties. The defendant therefore, in our view, had the benefit of the testimony as to his good reputation and honesty.

The next point made is the trial court erred in his charge to the jury in his comment concerning the testimony of the witness, Murphy, a police officer of New York. Another phase of this point has already been discussed. The error lay, so it is said, in what the court said on the matter of neutralization. This police officer, who performed the same character of duty in the police department of the City of New York as did the defendant, said on the trial of this indictment that the defendant, on the day in question, had been from time to time present at the police station in New York between the hours of six o'clock and half past nine in the evening. If he was, of course, he could not have been at Newark during those hours; in fact the defendant had testified that he had never been in Newark except on one occasion perhaps a year prior to the date in question and then on police business. When the testimony of Murphy was elicited under direct examination at the hands of the state's attorney the prosecutor claimed surprise and proceeded to show that the witness had made statements to the New Jersey authorities directly contrary to the statements made in his direct examination. On direct examination he said that Barts was at the station at six o'clock on the night in question and that both reported for duty; that he remained in the precinct for a while and that he saw him again at 9:30, in fact made an arrest with him. It was shown that he had been examined by Lieutenant Sklarey in New York during the month of August at which examination he stated that he could not say that Barts was at the station on March 25th, at six o'clock and admitted that he said on the previous occasion that on one night duty, when he and Barts were in the same contingent, Barts failed to appear until ten P. M.; that Barts had telephoned in to the precinct from outside stating that he

would be a little late; that he was working on a particular case, and that he made his appearance at the precinct two or three hours later; and in the prior examination he was also asked whether anyone had been able to establish whether or not Barts was in New York City on March 25th, between three P. M. and nine in the evening and the answer was "not that I know of." The court instructed the jury that the statements which Murphy had previously given to Lieutenant Sklarey neutralized his testimony on the stand at the trial of the case and explained that the former was "offered to cancel out" the latter. Concerning this, plaintiff in error says the court should have charged the jury that if, subsequent to the making of the antecedent, contrary statements, his recollection had been refreshed he would thereby be enabled to testify as he had in the case. We perceive no merit in the argument. There was no such request to charge proffered the trial court. The plaintiff in error complains not so much about what the court said as what the court, in his judgment, should have said. (Compare *State* v. *Capawanna,* 118 *N. J. L.* 429; *affirmed,* 119 *Id.* 337.) The failure to charge a proposition, even though applicable to the facts of the case, cannot be made the basis of an assignment of error without a request to charge. *State* v. *Barone,* 96 *N. J. L.* 417, 423. It is not said that the neutralization rule, as defined by the judge to the jury, was inaccurate but it is suggested that something should have been added. But this, as has been pointed out, even if appropriate, may not be assigned for error in the absence of a request so to charge. *State* v. *Larsen,* 105 *Id.* 266, 269.

We have examined the assignments of error (66 in all) and specifications of causes for reversal (81 in number) and find none of the assignments of error to be meritorious, nor do we find from the specifications of causes for reversal that the plaintiff in error suffered any manifest wrong or injury on the trial. Under the general review provided by our Criminal Procedure Act, *supra,* there is this provision: "No judgment given upon any indictment shall, however, be reversed * * * for any error except such as shall or may have prejudiced the defendant in maintaining his defense

upon the merits." Barts' defense was that he was in no way involved in the commission of the crime laid in the indictment; that he was not in Newark on the date in question; that he was in fact elsewhere and witnesses were produced to support that alibi. Without going into the detail, it is plain to us that the alibi on which he relied to offset the state's proof was seriously impaired by the testimony of persons, some of them superior officers in the New York police department, as well as departmental records. These witnesses impressed the jury, as they impressed us in reading this record, as disinterested persons. The jury's verdict cannot be said to have been the result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546. Consequently we think there is no merit in the argument that the verdict was contrary to the weight of the evidence.

The argument that Barts, even though he did each and every act which the testimony of the state's witnesses reveals, yet may not be legally convicted of extortion, has no substance as we view the law. Extortion, technically, is an official misdemeanor (*State* v. *Kirby,* 57 *N. J. L.* 320) and the crime is a form of malfeasance in office. The statute, *supra,* comprehends any officer of the law in its scope, whether he be of this or another state. Barts was such officer. The jury without doubt found that he threatened a process of law to terrify the Greenberg girl so that money was paid to him. He was not entitled to demand and receive money in the circumstances and if no payment can legally be claimed it is extortion corruptly to demand and receive it. (*Vide Bishop on Criminal Law* (*9th ed.*), § 395.) The argument that he did no duty and that he was paid for "not doing his office" is specious. The plaintiff in error, an officer, by color of his office, demanded and received a payment "not allowed by law for doing his office." These are the ingredients of the offense and there was proof to support each ingredient. In the line of duty he was obliged to arrest Marion Greenberg in New York for larceny. But instead he bargained for a reward—as the jury found—and, going to Newark, received it, something not allowed by law for doing his office—and the crime was committed in this jurisdiction.

The judgment is therefore affirmed.