**TRI–COUNTY NORTH LOCAL SCHOOL BOARD OF EDUCATION, Plaintiff,**

v.

**The McGUIRE & SHOOK CORP., Defendant.**

No. C–3–87–293.

United States District Court, S.D. Ohio, W.D.

July 6, 1989.

---

Michael J. Burdge, Dayton, Ohio, for plaintiff.

Carl Morgenstern, Roger S. Gates, Hamilton, Ohio, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. # 15)

RICE, District Judge.

This case is before the Court on the Plaintiff's Motion for Summary Judgment (Doc. # 15) filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons explained below, the Motion for Summary Judgment is overruled.

1. *The Facts*

While the facts of this case are not complex and are easily understood, the applicable law requires more than a passing inquiry into its historical significance.[1] Some time after the Tri–County North Local School District was created in 1983, the newly created Tri–County North Local School District Board of Education ("the Board"), the Plaintiff herein, determined that the existing physical facilities were inadequate for the educational needs of the district. The Board determined that since Ohio law would not permit a local bond issue to generate sufficient funds to build more adequate facilities, the Board would apply to the state of Ohio for funds from the State School Building Assistance Fund ("the Fund") (Doc. # 20).

The Fund is created by Chapter 3318 of the Ohio Revised Code ("O.R.C. § 3318"), and was established to assist school districts with the construction of school facilities by combining state money with money raised by the school district through a bond issue passed specifically for the purpose of constructing school facilities in the district. It is undisputed by the parties that the proceeds from the bond issue are kept separately from other school district funds in a project construction account in the name of the school district. (Doc. # 20, p. 10). In the case at bar, the Plaintiff applied for and received approval for State School Building Assistance Funds under O.R.C. § 3318.

Prior to the passage of the bond levy, Plaintiff entered into negotiations with Dr. Nancy Smith, an employee of the Defendant, The McGuire & Shook Corporation, to

---

1. The following facts are gleaned from the pleadings with particular emphasis upon the Defendant's Memorandum Contra (Doc. # 20) the Plaintiff's Motion for Summary Judgment. Since these facts are not challenged by any response by way of a Plaintiff's reply memoran- dum, and, further, since the resolution of the within motion depends not on the facts but rather upon the legal conclusion to be drawn from those facts, they are taken as true for the purpose of ruling upon the motion under discussion.

serve as an educational consultant to the Board for the purpose of assessing the needs of the school district and the scope of the project (*see* Doc. # 20, p. 3; citing Affidavit of Homer Evans). Since the Plaintiff desired to hire Dr. Smith as a "watch dog" over the architects to insure that the buildings would be designed according to specifications, the Plaintiff entered into a contract with Dr. Smith.[2] Subsequently, the Board entered into a second contract with the Defendant, The McGuire & Shook Corporation.

On December 27, 1985, Plaintiff delivered a copy of its contract with Dr. Smith to Mr. Burdge, its attorney, for review. Shortly thereafter on December 30, 1985, Mr. Burdge informed two members of the Board by phone that he was concerned that the contract contemplated an expenditure of funds for an illegal purpose—presumably because the contract did not contain a certificate of adequate funding signed by the school district's fiscal officers. Mr. Burdge confirmed his opinion with a follow-up letter dated January 2, 1986. Nonetheless, when the Smith and the McGuire & Shook contracts were presented to the Board by Dr. Evans (the Plaintiff's Superintendent of Schools) on December 30, 1985, they were unanimously approved and signed by all five members of the Board as well as the Board's Treasurer.

After the Board's approval of the contracts, the Defendants commenced work on a feasibility study which was undertaken to define the types of facilities which could be constructed with money from the Fund combined with proceeds to be generated by the passage of a bond levy the Tri–County

North Local School District hoped to pass. Additionally, the Board desired to use the feasibility study to present to the public to assist voters in making a decision on the levy. When the bond levy did ultimately pass, the Board directed the Defendant to begin working on the actual design of the facility.

In May, 1986, the Plaintiff voted to terminate the contract of its Treasurer for, among other reasons, that he had in fact failed to ascertain and otherwise to insure that purchase orders issued by the school district contained the prior certification as required by O.R.C. § 5705.41(D), which provides that no subdivision of the state could sign a contract for goods or services without attaching thereto a certificate signed by the fiscal officer that the funds required to meet the obligation on the contract were either in the treasury or in the process of collection and appropriated for such purpose provided in the contract and free of encumbrances.[3]

Throughout the following months, the Plaintiff continued to take numerous actions related to the building project; directed its bond counsel to issue bonds; hired a surveying firm to provide the necessary surveys for the building programs based on specifications from the Defendant and approved the schematic drawings for the proposed elementary school building to be constructed in Verona. (Doc. # 20).

Within the same time frame that the Plaintiff acted so to approve the schematic drawings for the proposed elementary school building in Verona, the Plaintiff accepted the resignation of Dr. Evans as its

---

**2.** The lawsuit against Dr. Smith, although consolidated with the action against her employer, McGuire & Shook, is not relevant to the matter addressed herein. The reference in this Opinion to "Defendant" refers only to the McGuire & Shook Corporation.

**3.** Section 5705.41(D) provides in pertinent part: No subdivision or taxing unit shall ... except as otherwise provided in Section 5705.413 ... of the Revised Code, make any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obli-

gation or in the case of the continuing contract to be performed in whole or in part in an ensuing fiscal year, the amount required to meet the obligation in the fiscal year in which the contract is made, has been lawfully appropriated for such purpose and is in the treasury or in the process of collection to the credit of an appropriate fund free from any previous encumbrances. This certificate need be signed only by the subdivision's fiscal officer. Every such contract made without such a certificate shall be void, and no warrant shall be issued in payment of any amount due thereon.

superintendent and named Mr. James Walker as its interim superintendent. After meeting with the Defendant to discuss the status of the building contract, Mr. Walker developed some concerns as to the validity of the underlying contracts with the Defendant and Dr. Smith. Mr. Walker consulted with the Preble County Prosecutor as well as with Mr. Burdge, the Board's attorney. As a result of the legal advice Mr. Walker received, he attempted to renegotiate a new contract with the Defendant, modifying the scope of the project from two facilities to one. When negotiations reached an impasse, this litigation ensued.

### 2. *The Procedural Posture of the Case*

The Plaintiff filed a lawsuit in the Court of Common Pleas of Preble County, Ohio, against the Defendant McGuire & Shook seeking a declaratory judgment on the validity and enforceability of its contract with the Defendant, claiming that the contract was invalid and unenforceable because it lacked the necessary certification referred to above. The Defendant filed an Answer and Counterclaim claiming its contract with the Plaintiff was enforceable and seeking payment for services rendered in connection with its contract with the Board. This case was removed to federal court on petition by the Defendant and the Court subsequently ordered that the within lawsuit be consolidated with that filed by the Plaintiff against the Defendant, Dr. Nancy Smith. This case is now before the Court on the Plaintiff's Motion for Summary Judgment.

### 3. *The Arguments*

On a Federal Rule 56 Motion for Summary Judgment, same cannot be granted if a genuine issue of material fact exists, after construing the evidence most strongly in favor of the party against whom the motion is directed, giving that party the benefit of every reasonable inference to be drawn therefrom. That is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party, the Motion for Summary Judgment must be overruled. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). In ruling on a motion for summary judgment, the trial judge's function is not to weigh the evidence and to determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. at 2510. In essence, the inquiry is whether the evidence presents a sufficient disagreement, a sufficient conflict, to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law. *Id.* at 249–50, 106 S.Ct. at 2510–11.

Initially, the party seeking summary judgment bears the burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This accomplished, the burden then shifts to the non-moving party to designate specific facts demonstrating that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. The plain language of Rule 56(c) mandates the entry of summary judgment against the non-moving party who fails to make a showing sufficient to establish the existence of a factual dispute on an element essential to that party's case and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. With this standard in mind, this Court now considers the reasoning urged in support of the Plaintiff's motion.

The Plaintiff has moved this Court for summary judgment on the ground that no genuine issue of material fact exists with respect to the validity of the Defendant's contract with the Board. Specifically, the Plaintiff argues that the contract in question does not have attached thereto the certificate required under O.R.C. § 5705.412 and therefore the contract is void and unenforceable.

O.R.C. § 5705.412 provides in pertinent part as follows:

> No school district shall ... make any contract ... unless there is attached thereto a certificate signed by the Treasurer and the President of the Board of Education and the Superintendent that the School District has in effect for the

remainder of the fiscal year and the succeeding fiscal year the authorization to levy taxes including the renewal of existing levies which, when combined with the estimated revenue from all other sources available to the district at the time of certification, are sufficient to provide the *operating revenues* necessary to enable the district to operate an adequate educational program for all the days set forth in its adopted school calendars for the current fiscal year and for a number of days in the succeeding fiscal year equal to the number of days instruction was held or scheduled for the current fiscal year ... every contract made ... without such a certificate shall be void and no payment of any amount due thereon shall be made. (Emphasis added).

Defendant argues in opposition to the Plaintiff's motion that since the funds used to pay for the Defendant's services would not affect the *operating revenues* of the school district, the contract in question does not fall within the certification requirements of O.R.C. § 5705.412; that is, since the contract was to be funded solely from proceeds raised through a bond issue combined with state school building assistance funds, the contract in question does not require the certification that there would remain sufficient "operating revenues" to "operate an adequate educational program."

The Defendant supports this claim with the argument that under a similar section of the Ohio Revised Code, § 5705.41 (see pertinent quotation in footnote 3), the Butler County Common Pleas Court of Ohio held in a 1950 case, *Jones v. City of Middletown*, 96 N.E.2d 799 (Butler Cty.1950), that where the contract involves expenditures from a special fund other than the general operating funds of the subdivision, a certificate of available funds is not required. Accordingly, Defendant asserts that since O.R.C. §§ 5705.41 and 5705.412 are "virtually identical", O.R.C. § 5705.412 (the statute whose construction is at issue herein) should be interpreted in the same fashion, to wit: that no certification is re-

quired and that, therefore, the contract at issue is valid and enforceable.

While the Court agrees with Defendant that school board contracts which are to be paid out of special funds not affecting the operating revenues of the school district do not require certification under O.R.C. § 5705.412, the Court disagrees that §§ 5705.41 and 5705.412 are "virtually identical" today. In fact, although O.R.C. §§ 5705.412 and 5705.41 have a common historical origin, it is the absence of some critical language, found in O.R.C. § 5705.41 but not in O.R.C. § 5705.412, upon which the Court in part bases its interpretation that certification is not required in this case.

### 4. *The Applicable Law*

The genesis of O.R.C. §§ 5705.412 and 5705.41 dates back to 1874, when the Ohio legislature passed what is known as the Worthington law, which provided that the city of Cincinnati could borrow $1 million to rid itself of a debt in a proportion similar to that which the city had incurred by contracting for debts and making appropriations in greater amounts than the city could afford. *Emmert v. Elyria*, 74 Ohio St. 185, 193, 78 N.E. 269 (1906). The Worthington law supplemented a similar provision in the state municipal code, also enacted in 1874, which provided that the City Council of Cincinnati was prohibited from "making appropriations or contracting for debts for the *ordinary purposes of the city, exceeding the amount of taxes and revenues from other sources for the current year*". *State, ex rel Seiter v. Hoffman*, 25 Ohio St. 328, 333 (1874) (emphasis in the original). In addition thereto, the Municipal Code required:

... no ordinance or other order for the expenditure of money shall be passed by the City Council or any board or any officer or any commissioner having control over the money of the city without stating specifically in such ordinance or order the items of expense to be made under it and no such ordinance or order shall take effect until the auditor of said city [Cincinnati] shall certify to the City Council there is money in the treasury

especially set apart to meet such expenditure and all expenditures greater than the amount specified in such ordinance or order shall be absolutely void. 71 O.L. 80 (April 16, 1874).

In 1874, this portion of the Municipal Code applied only to the city of Cincinnati. Its remedial provisions were given general application to all municipalities in the state of Ohio in 1876 by the enactment of the Burns law codified in Ohio Revised Statutes ("R.S.") §§ 1693 and 2702 (Derby 1879). *Emmert v. Elyria, supra,* 74 Ohio St. at 193, 78 N.E. 269.

At least initially, the clear intent of the Ohio legislature in enacting the Burns law was to prevent municipalities in Ohio from incurring debt problems of the type experienced by Cincinnati as a result of contracting for debts in greater amounts than the city could finance from its present tax revenues. Indeed, this is how the Ohio Supreme Court interpreted the Burns law in the case of *The City of Cincinnati v. Holmes,* 56 Ohio St. 104, 113–14, 46 N.E. 514 (1897):

> The plain purpose of the Burns law was to prevent the incurring of an indebtedness by a municipal corporation beyond the *ordinary sources* of its *revenue* and whereby an annual excess of indebtedness will be created over these revenues ... Where a contract is made to be discharged from a *general fund,* that may be applied to a variety of purposes, more obligations may be incurred by way of anticipation than can be discharged from it, thus causing an annual deficit, to meet which increased taxation must be resorted to. Hence, the wisdom of the Burns law, which in such cases, requires that the money must be in the treasury, applicable to a particular expenditure before it is made ... (emphasis added)

The Burns law took various forms on the statute books of Ohio over the next century, some of which last to this day, including O.R.C. §§ 5705.412 and 5705.41. In 1934, the Ohio Supreme Court noted that the common purpose of the various forms of the Burns law were their "... restrictive features ... similar in context [which serve] a useful and salutory purpose in curtailing the unwise and reckless expenditure of public funds when such funds [are] not on hand or in sight." *Mayfield Heights v. Irish,* 128 Ohio St. 329, 333, 191 N.E. 129 (1934). In another case, the Ohio Supreme Court again remarked in similar tone: "The Burns law in our judgment is one of the most wholesome laws of restricted nature, ever put upon the statute books, and its spirit and letter should be scrupulously respected and followed. *Clearly, however, it was designed to apply to the usual and ordinary, and every day transactions between the public and the city through its officers. Youngstown v. First Nat. Bank,* 106 Ohio St. 563, 571, 140 N.E. 176 (1922)" (emphasis added) (Burns law held not to apply in emergency situation where sums were lent by plaintiff bank to the city for the payment of the emergency patrolmen appointed by the Mayor of the City of Youngstown during the steel strike of 1919).

On April 27, 1896, a version of the Burns law was passed which applied specifically to contracts made and expenditures of funds ordered by the boards of education within the state of Ohio. Revised Statute § 2834(b) provided as follows:

> [T]he Board of Education ... shall enter into no contract, agreement or obligation involving expenditure of money, nor shall any resolution or order involving the expenditure of money, nor shall any resolution or order for the appropriation or expenditure of money be passed by any ... board of education ... unless the auditor or clerk thereof shall first certify that the money required for the payment of the obligation or appropriation is in the treasury to the credit of the fund from which it is to be drawn or has been levied and placed on the due book, and in the process of collection and not appropriated for any purpose....

This particular version of the Burns law as made applicable to boards of education was held unconstitutional by decisional law since certain city districts were excepted from its application. *Peter Bowers, et al. v. Fulton Tp., Fulton Co. (Bd. of Ed.), et*

*al.*, 28 Ohio C.C.Dec. 624 (8 N.S. 305) (1906) *aff'd, no opinion,* 78 Ohio St. 443, 85 N.E. 1120 (1908). Following this decision, R.S. § 2834(b) was supplanted by § 5660 of the General Code ("G.C."). The 1908 version of § 5660 was substantially similar to R.S. § 2834(b) cited above except that it applied to *all* school districts throughout Ohio. In 1910, G.C. § 5660 was amended to include the following critical language: "... Money to be derived from lawfully authorized bonds sold and in the process of delivery shall for the purpose of this section be deemed in the treasury and in the appropriate fund ..."

An Ohio Court of Appeals had its first opportunity to interpret this language in the case of *Knowlton and Breinig v. Board of Education,* 13 Ohio App. 30 (Licking Cty.1919). In *Knowlton,* the plaintiff, a partnership business, bid on a contract to add an additional building and to provide a new heating and ventilating system to the already existing school building in the Village of Johnstown, Ohio. The projects were to be funded by bonds sold by the village specifically for the purpose of funding the school building projects. No certificate of adequate funding was issued or attached to the contract. The plaintiff argued that since the Defendant Board of Education sold bonds for the contemplated improvement, the certificate of the clerk was unnecessary. The court disagreed and invalidated the contract because it did not contain the certificate. The court reasoned that there was only *one* bond issue to pay for *all* the school improvements and since plaintiff only bid for *part* of the contract, the certificate was required to insure that *all* the contractors on the project could be paid from the proceeds of the bond issue. *Id.* at 40. The court did not indicate if the certificate would be required if the plaintiff had been the *sole bidder* on a contract for *all* the improvements to be funded by a bond issue, but stated only that since there were several bidders in this case, on several different improvements in addition to those upon which the Plaintiff had bid, it was apparent that the object of the recent amendment to § 5660 "was not to dispense entirely with

the certificate by such officer when bonds are sold." *Id.* at 45.

By 1925, G.C. § 5660 as amended in 1910 was repealed. In its stead, a new version of G.C. § 5660 was enacted which did not specifically refer to boards of education. The new version of § 5660 required "any county or political subdivision or taxing district" to attach a certificate of adequate funding on any "contract, agreement or obligation involving the expenditure of money." The critical language which made reference to funds raised by a bond issue was left intact from the former version of G.C. § 5660. Additionally, under the definition section, school districts were said to be "taxing districts" within the meaning of G.C. § 5660. Ohio Gen.Code Ann. § 5665-4 (Throckmorton 1926). The decision in *Southern Surety Company v. Moores–Coney Co.,* 29 Ohio App. 310, 163 N.E. 575 (Clermont Cty.1928), upon which Plaintiff places great reliance in its summary judgment motion, was based on the 1925 version of G.C. § 5660. In *Moores,* on facts similar to the case at the bar, the appellant construction company argued that the failure of the City Clerk to attach a certificate of sufficient funding to a contract between the construction company and the school board for construction of a school building was not fatal to the validity of the contract, since the school was being erected with the proceeds of bonds issued and sold for that purpose. The Clermont County Court of Appeals disagreed and held that the contract was void since it lacked the certificate of sufficient funds as required under G.C. § 5660 as amended. The court stated that the full disposition of its reasons for voiding the contract could be found in its decision in the cases of *Thomas v. Board of County Commissioners of Butler County* and *State ex rel Seeman v. Kinch,* found at 28 Ohio App. 8, 162 N.E. 430 (Butler Cty.1923). Therein, the court stated:

> In the [case of *Village of Carthage v. Diekmeier,* 79 Ohio St. 323, 341, 87 N.E. 178 (1902) ] ... the improvement was to be paid for by a bond issue, and the [Ohio] Supreme Court found that a certif-

icate was necessary ... this would seem to be sufficient authority on which to ground the decision in the instant case ... We are therefore of the opinion that there is no binding authority requiring us to construe §§ 5660 and 5661 as not applying to contracts where improvements are to be paid by an issue of bond ... The section [providing that "Money to be derived from lawfully authorized bonds sold, and in process of delivery, for the purpose of this section, shall be deemed in the treasury and in the appropriate fund ..." means that] ... if lawfully authorized bonds have been sold and are in the process of delivery, the auditor is then authorized to make the certificate that the money is in the treasury and unappropriated, etc ... Why the law should have been made the football of judicial decisions, we are unable to understand. There are many good reasons to be advanced in favor of the law. That it sometimes works a hardship due to negligence of contractors in not observing the requirements is beside the question ... There are many reasons why it should apply even in the case of a bond issue. If the law is not to apply in this case of a bond issue, let the legislature say so by way of exception.

Section 5660, as amended in 1925, was repealed in 1927 and replaced by § 5625–33. General Code § 5625–33 applied to boards of education as "taxing districts" and also contained the language which made reference to funds raised by a bond issue. In 1928, the Ohio Attorney General had the opportunity to interpret this language and issued an opinon as to facts squarely on point with the case at bar, which provided in pertinent part:

A contract with an architect, for the preparation of plans, specifications for school buildings and supervision of the erection of same, is invalid unless there is attached thereto a certificate of a fiscal officer of the school district that the amount of money required to meet the same has been lawfully appropriated for such purpose, and is in the treasury or in the process of collection to the credit of an appropriate fund, free from any previ-

ous encumbrances. 1928 0p. Ohio Att'y Gen. 2163.

In 1953, the Ohio General Code was revised and G.C. § 5625–33 became Ohio Revised Code § 5705.41. This version of the Burns law (O.R.C. § 5705.41) can still be found in the Revised Code today and contains the following language, "... Money to be derived from the lawfully authorized bonds sold and in the process of delivery shall for the purpose of this section be deemed in the treasury and in the appropriate fund." This is significant language in view of the fact that the Court of Appeals decisions interpreting identical language in *Southern Surety Company v. Moores–Coney Co.,* 29 Ohio App. 310, 163 N.E. 575 (Clermont Cty.1928) and *Knowlton and Breinig v. Board of Education,* 13 Ohio App. 30 (Licking Cty.1919) have never been overruled. In those cases, the courts held that certification of adequate funding is required under O.R.C. § 5705.41(D) on contracts made by school districts even when funds used to pay on said contracts come from proceeds of a bond levy.

However, since the enactment of O.R.C. § 5705.412, O.R.C., § 5705.41 no longer applies to contracts made by boards of education. In 1971, the Ohio legislature enacted Ohio Revised Code § 5705.412 which applies specifically to boards of education and does *not* contain the language with reference to money raised by a bond issue. Certainly, until the enactment of O.R.C. § 5705.412 in 1971, O.R.C. § 5705.41 was held to apply to boards of education. *See Stanley v. Like,* 22 Ohio Op.2d 274, 90 Ohio L.Abs. 587, 190 N.E.2d 697 (Scioto Cty. 1962); *Bd. of Educ. v. Strausser,* 20 Ohio Misc. 1, 251 N.E.2d 515 (Erie Cty.1969); *State ex rel. Kuhn v. Smith,* 25 Ohio Op.2d 203, 92 Ohio L.Abs. 527, 194 N.E.2d 186 (Monroe Cty.1963). Thereafter, with the enactment of O.R.C. § 5705.412, the law is clear that the provisions of O.R.C. § 5705.412 are controlling as to contracts made by boards of education. *Board of Education v. Maple Heights Teachers Association,* 41 Ohio Misc. 27, 322 N.E.2d 154 (1973) ("... the provisions of R.C. § 5705.412 take precedence over any con-

tained in R.C. § 5705.41"); *CADO Bus. Sys. v. Bd. of Educ. of Cleveland,* 8 Ohio App.3d 385, 457 N.E.2d 939 (Ohio App. 1983) ("Clearly, it was the legislative intent that R.C. 5705.412 should take precedence over R.C. 5705.41"). Having established that O.R.C. 5705.412 controls with respect to contracts made by boards of education, the issue presented is whether the absence of the language referring to the funds raised by a bond issue in O.R.C. § 5705.412 is significant. Specifically, is a certificate of adequate funding required on a contract made by a school board, where the debt contracted for is to be paid by the proceeds from a bond issue, combined with state school building assistance funds, which is to be kept in an account separate from the operating revenues of the school district?

The overwhelming evidence is that if O.R.C. § 5705.41 still applied to school boards, then a certificate of adequate funding would be required as to contracts made by boards of education even when the money to pay for the contract would be raised from a bond issue. *See, e.g., Southern Surety Company v. Moores–Coney Co.,* 29 Ohio App. 310, 163 N.E. 575. However, for the reasons explained below and, further, since the Ohio courts have held that O.R.C. § 5705.412 takes precedence over § 5705.41 with respect to contracts made by boards of education, this Court holds that certification is not required.

In view of the fact that O.R.C. § 5705.412 does not contain the critical language with reference to a bond issue (which the courts in *Moores–Coney* and *Knowlton & Breinig* interpreted to mean under O.R.C. § 5705.41 that even when the contract was to be paid by money raised from a bond issue, certification would be required), this Court presumes that the Ohio legislature intended to omit the requirement of certification on contracts by school boards, where the funds to pay for same would come from bond levy proceeds which would not disturb the operating revenues of the school district. *See Szekely v. Young,* 174 Ohio St. 213, 188 N.E.2d 424 (1963) *citing State v. Barts,* 132 N.J.L. 74, 80, 38 A.2d 838, 843 (1944) ("The rule of construction is that when a later statute

omits words ... included previously in the law, such omission is meaningful and was done with full knowledge and approval of its effect.") The legislature is presumed to know and to be aware of not only the statutory law which is being impacted upon by the new legislation, but also decisional law interpreting same. *See also State, ex rel Board of Education v. Howard,* 167 Ohio St. 93, 98, 146 N.E.2d 604 (1957) ("The legislature, in enacting amendments to existing statutory law, is presumed to be cognizant of prior judicial construction of that law.") While O.R.C. § 5705.412 is not, strictly speaking, an amendment to O.R.C. § 5705.41, it is most definitely a "carve out" or lineal descendant of § 5705.41. At the time that § 5705.412 was enacted in 1971, the legislature was presumably aware of the Ohio decisional law to the effect that, with regard to § 5705.41, even when the contract was to be paid by money raised from a bond issue, certification would be required. Further, the legislature when it enacted § 5705.412 was presumably cognizant of two factors: *First,* that the newly enacted statute would be construed to take precedence over its lineal ancestor—the statute from or out of which it was carved and, *second,* that the omission of certain critical language from the new statutory section, upon which critical case law interpreting the older statute was based, would be interpreted to indicate a legislative intent not to "burden" the new statutory section with the decisional law interpretation of the older statute from which the newer was birthed.

Moreover, earlier Ohio decisional law with respect to O.R.C. § 5705.41 supports this Court's interpretation. In *State ex. rel. Seiter v. Hoffman,* 25 Ohio St. at 333, the Ohio Supreme Court explained that the purpose of certification on contracts made by subdivisions of the government was to prohibit same from "making appropriations or contracting for debts for the *ordinary purposes of the city, exceeding the amount of taxes and revenues from other sources for the current year.*" (emphasis in the original). Likewise, in *The City of Cincinnati v. Holmes,* 56 Ohio St. 104,

**550**

113–14, 46 N.E. 514, the court again remarked that the "plain purpose" of the certification requirement "was to prevent the incurring of an indebtedness by a municipal corporation beyond the *ordinary sources* of its *revenue* and whereby an annual excess of indebtedness will be created over these revenues ..." (emphasis added). *See also, Youngstown v. First Nat. Bank*, 106 Ohio St. 563, 571, 140 N.E. 176 (1922) (stating that Burns Law was "designed to apply to the usual and ordinary, and every day transactions between the public and the city through its officers").

This language from Ohio decisional law (which bespeaks a concern for protecting the ordinary sources of revenue of government) coupled with the omission of the pertinent bond language in O.R.C. § 5705.412, leads this Court to the conclusion that when a construction project for a school district is to be funded through proceeds from a bond issue combined with state building assistance funds, certification would neither be relevant nor necessary since the contract could not affect the general source of funds which is available to operate the ordinary services of government.[4]

The Plaintiff has moved this Court for summary judgment on the ground that no genuine issue of material fact exists with respect to the validity of the Defendant's contract with the Board. On the contrary, this Court holds that the absence of certification as defined under O.R.C. § 5705.412 is not a bar to the validity of the contract in question.

WHEREFORE, based upon the aforesaid, the Plaintiff's Motion for Summary Judgment must be and is overruled.

---

4. The fact that the contract-in-question in the case at bar would be paid from proceeds of a bond levy and would not impact upon the operating revenues of the school district, distinguishes this case from such cases as *Brownfield, Bowen, Bally & Sturtz v. Bd. of Education*, 56 Ohio App.2d 10, 381 N.E.2d 207 (Jackson Cty. 1977), a labor contract case, in which the Ohio Court of Appeals held that a school board could not be forced, as a moral obligation or otherwise, to pay for services rendered under a contract unaccompanied by a certificate of sufficient funding.