# EVANS *v.* UNITED STATES

No. 90–6105.   Argued December 9, 1991—Decided May 26, 1992

STEVENS, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, and SOUTER, JJ., joined, in Parts I and II of which O'CONNOR, J., joined, and in Part III of which KENNEDY, J., joined. O'CONNOR, J., *post*, p. 272, and KENNEDY, J., *post*, p. 272, filed opinions concurring in part and concurring in the judgment. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 278.

*C. Michael Abbott,* by appointment of the Court, 501 U. S. 1229, argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Bryson* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Christopher J. Wright,* and *Richard A. Friedman.*

JUSTICE STEVENS delivered the opinion of the Court.

We granted certiorari, 500 U. S. 951 (1991), to resolve a conflict in the Circuits over the question whether an affirmative act of inducement by a public official, such as a demand, is an element of the offense of extortion "under color of official right" prohibited by the Hobbs Act, 18 U. S. C. § 1951. We agree with the Court of Appeals for the Eleventh Circuit that it is not, and therefore affirm the judgment of the court below.

## I

Petitioner was an elected member of the Board of Commissioners of DeKalb County, Georgia. During the period between March 1985 and October 1986, as part of an effort by the Federal Bureau of Investigation (FBI) to investigate allegations of public corruption in the Atlanta area, particularly in the area of rezonings of property, an FBI agent posing as a real estate developer talked on the telephone and met with petitioner on a number of occasions. Virtually all, if not all, of those conversations were initiated by the agent and most were recorded on tape or video. In those conversations, the agent sought petitioner's assistance in an effort to rezone a 25-acre tract of land for high-density residential use. On July 25, 1986, the agent handed petitioner cash totaling $7,000 and a check, payable to petitioner's campaign, for $1,000. Petitioner reported the check, but not the cash, on his state campaign-financing disclosure form; he also did not report the $7,000 on his 1986 federal income tax return. Viewing the evidence in the light most favorable to the Government, as we must in light of the verdict, see *Glasser* v. *United States*, 315 U. S. 60, 80 (1942), we assume that the jury found that petitioner accepted the cash knowing that it was intended to ensure that he would vote in favor of the rezoning application and that he would try to persuade his fellow commissioners to do likewise. Thus, although petitioner did not initiate the transaction, his acceptance of the bribe constituted an implicit promise to use his official position to serve the interests of the bribegiver.

In a two-count indictment, petitioner was charged with extortion in violation of 18 U. S. C. § 1951 and with failure to report income in violation of 26 U. S. C. § 7206(1). He was convicted by a jury on both counts. With respect to the extortion count, the trial judge gave the following instruction:

> "The defendant contends that the $8,000 he received from agent Cormany was a campaign contribution. The

solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.

"However, if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." App. 16–17.

In affirming petitioner's conviction, the Court of Appeals noted that the instruction did not require the jury to find that petitioner had demanded or requested the money, or that he had conditioned the performance of any official act upon its receipt. 910 F. 2d 790, 796 (CA11 1990). The Court of Appeals held, however, that "passive acceptance of a benefit by a public official *is* sufficient to form the basis of a Hobbs Act violation if the official knows that he is being offered the payment in exchange for a specific requested exercise of his official power. The official need not take any specific action to induce the offering of the benefit." *Ibid.* (emphasis in original).[1]

This statement of the law by the Court of Appeals for the Eleventh Circuit is consistent with holdings in eight other

---

[1] The Court of Appeals explained its conclusion as follows:

"[T]he requirement of inducement is *automatically* satisfied by the power connected with the public office. Therefore, once the defendant has shown that a public official has accepted money in return for a requested exercise of official power, no additional inducement need be shown. 'The coercive nature of the official office provides all the inducement necessary.'" 910 F. 2d, at 796–797 (footnote omitted).

Circuits.[2]  Two Circuits, however, have held that an affirmative act of inducement by the public official is required to support a conviction of extortion under color of official right. *United States* v. *O'Grady,* 742 F. 2d 682, 687 (CA2 1984) (en banc) ("Although receipt of benefits by a public official is a necessary element of the crime, there must also be proof that the public official did something, under color of his public office, to cause the giving of benefits"); *United States* v. *Aguon,* 851 F. 2d 1158, 1166 (CA9 1988) (en banc) ("We find ourselves in accord with the Second Circuit's conclusion that inducement is an element required for conviction under the Hobbs Act").  Because the majority view is consistent with the common-law definition of extortion, which we believe Congress intended to adopt, we endorse that position.

## II

It is a familiar "maxim that a statutory term is generally presumed to have its common-law meaning." *Taylor* v. *United States,* 495 U. S. 575, 592 (1990).  As we have explained: "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a depar-

---

[2] See *United States* v. *Garner,* 837 F. 2d 1404, 1423 (CA7 1987), cert. denied, 486 U. S. 1035 (1988); *United States* v. *Spitler,* 800 F. 2d 1267, 1274–1275 (CA4 1986); *United States* v. *Jannotti,* 673 F. 2d 578, 594–596 (CA3) (en banc), cert. denied, 457 U. S. 1106 (1982); *United States* v. *French,* 628 F. 2d 1069, 1074 (CA8), cert. denied, 449 U. S. 956 (1980); *United States* v. *Williams,* 621 F. 2d 123, 123–124 (CA5 1980), cert. denied, 450 U. S. 919 (1981); *United States* v. *Butler,* 618 F. 2d 411, 417–420 (CA6), cert. denied, 447 U. S. 927 (1980); *United States* v. *Hall,* 536 F. 2d 313, 320–321 (CA10), cert. denied, 429 U. S. 919 (1976); *United States* v. *Hathaway,* 534 F. 2d 386, 393–394 (CA1), cert. denied, 429 U. S. 819 (1976).

ture from them." *Morissette* v. *United States*, 342 U. S. 246, 263 (1952).[3]

At common law, extortion was an offense committed by a public official who took "by colour of his office"[4] money that was not due to him for the performance of his official duties.[5] A demand, or request, by the public official was not an element of the offense.[6] Extortion by the public official was the rough equivalent of what we would now describe as "taking a bribe." It is clear that petitioner committed that offense.[7] The question is whether the federal statute, insofar

---

[3] Or, as Justice Frankfurter advised, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947).

[4] Blackstone described extortion as "an abuse of public justice, which consists in an officer's unlawfully taking, *by colour of his office*, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." 4 W. Blackstone, Commentaries *141 (emphasis added). He used the phrase "by colour of his office," rather than the phrase "under color of official right," which appears in the Hobbs Act. Petitioner does not argue that there is any difference in the phrases. Hawkins' definition of extortion is probably the source for the official right language used in the Hobbs Act. See Lindgren, The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815, 864 (1988) (hereinafter Lindgren). Hawkins defined extortion as follows:

"[I]t is said, That extortion in a large sense signifies any oppression under colour of right; but that in a strict sense, it signifies the taking of money by any officer, by colour of his office, either where none at all is due, or not so much is due, or where it is not yet due." 1 W. Hawkins, Pleas of the Crown 316 (6th ed. 1787).

[5] See Lindgren 882–889. The dissent says that we assume that "common-law extortion encompassed *any* taking by a public official of something of value that he was not 'due.'" *Post*, at 279. That statement, of course, is incorrect because, as stated in the text above, the payment must be "for the performance of his official duties."

[6] Lindgren 884–886.

[7] Petitioner argued to the jury, at least with respect to the extortion count, that he had been entrapped, see App. 20; however, in light of the jury's verdict on that issue, we must assume that he was predisposed to commit the crime.

as it applies to official extortion, has narrowed the common-law definition.

Congress has unquestionably *expanded* the common-law definition of extortion to include acts by private individuals pursuant to which property is obtained by means of force, fear, or threats. It did so by implication in the Travel Act, 18 U. S. C. § 1952, see *United States* v. *Nardello*, 393 U. S. 286, 289–296 (1969), and expressly in the Hobbs Act. The portion of the Hobbs Act that is relevant to our decision today provides:

> "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
>
> "(b) As used in this section—
>
> .     .     .     .     .
>
> "(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U. S. C. § 1951.

The present form of the statute is a codification of a 1946 enactment, the Hobbs Act,[8] which amended the federal Anti-Racketeering Act.[9] In crafting the 1934 Act, Congress was

---

[8] The 1946 enactment provides:

"The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.'" Act of July 3, 1946, ch. 537, § 1(c), 60 Stat. 420.

[9] Section 2(b) of the 1934 Act read as follows:

"SEC. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

.     .     .     .     .

careful not to interfere with legitimate activities between employers and employees. See H. R. Rep. No. 1833, 73d Cong., 2d Sess., 2 (1934). The 1946 amendment was intended to encompass the conduct held to be beyond the reach of the 1934 Act by our decision in *United States* v. *Teamsters,* 315 U. S. 521 (1942).[10] The amendment did not make any significant change in the section referring to obtaining property "under color of official right" that had been prohibited by the 1934 Act. Rather, Congress intended to broaden the scope of the Anti-Racketeering Act and was concerned pri-

---

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right." Act of June 18, 1934, ch. 569, § 2, 48 Stat. 979–980.

One of the models for the statute was the New York statute:

"Extortion is the obtaining of property from another, or the obtaining the *[sic]* property of a corporation from an officer, agent or employee thereof, with his consent, induced by a wrongful use of force or fear, or under color of official right." Penal Law of 1909, § 850, as amended, 1917 N. Y. Laws, ch. 518, codified in N. Y. Penal Law § 850 (McKinney Supp. 1965).

The other model was the Field Code, a 19th-century model code:

"Extortion is the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right." Commissioners of the Code, Proposed Penal Code of the State of New York § 613 (1865) (Field Code).

Lindgren points out that according to the Field Code, coercive extortion and extortion by official right extortion are separate offenses, and the New York courts recognized this difference when, in 1891, they said the Field Code treats "extortion by force and fear as one thing, and extortion by official action as another." *People* v. *Barondess,* 61 Hun. 571, 576, 16 N. Y. S. 436, 438 (App. Div. 1891). The judgment in this case was later reversed without opinion. See 133 N. Y. 649, 31 N. E. 240 (1892). Lindgren identifies early English statutes and cases to support his contention that official extortion did not require a coercive taking, nor did it under the early American statutes, including the later New York statute. See Lindgren 869, 908.

[10] In *United States* v. *Teamsters,* the Court construed the exemption for "'the payment of wages by a bona-fide employer to a bona-fide employee'" that was contained in the 1934 Act but is no longer a part of the statute. 315 U. S., at 527.

marily with distinguishing between "legitimate" labor activity and labor "racketeering," so as to prohibit the latter while permitting the former. See 91 Cong. Rec. 11899–11922 (1945).

Many of those who supported the amendment argued that its purpose was to end the robbery and extortion that some union members had engaged in, to the detriment of all labor and the American citizenry. They urged that the amendment was not, as their opponents charged, an antilabor measure, but rather, it was a necessary measure in the wake of this Court's decision in *United States* v. *Teamsters.*[11] In their view, the Supreme Court had mistakenly exempted labor from laws prohibiting robbery and extortion, whereas Congress had intended to extend such laws to all American citizens. See, *e. g.*, 91 Cong. Rec. 11910 (1945) (remarks of Rep. Springer) ("To my mind this is a bill that protects the honest laboring people in our country. There is nothing contained in this bill that relates to labor. This measure, if passed, will relate to every American citizen"); *id.*, at 11912 (remarks of Rep. Jennings) ("The bill is one to protect the right of citizens of this country to market their products without any interference from lawless bandits").

Although the present statutory text is much broader[12] than the common-law definition of extortion because it encompasses conduct by a private individual as well as conduct

---

[11] In fact, the House Report sets out the text of *United States* v. *Teamsters* in full, to make clear that the amendment to the Anti-Racketeering Act was in direct response to the Supreme Court decision. See H. R. Rep. No. 238, 79th Cong., 1st Sess., 1–10 (1945).

[12] This Court recognized the broad scope of the Hobbs Act in *Stirone* v. *United States,* 361 U. S. 212, 215 (1960):

"That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'"

by a public official,[13] the portion of the statute that refers to official misconduct continues to mirror the common-law definition. There is nothing in either the statutory text or the legislative history that could fairly be described as a "contrary direction," *Morissette* v. *United States*, 342 U. S., at 263, from Congress to narrow the scope of the offense.

The legislative history is sparse and unilluminating with respect to the offense of extortion. There is a reference to the fact that the terms "robbery and extortion" had been construed many times by the courts and to the fact that the definitions of those terms were "based on the New York law." 89 Cong. Rec. 3227 (1943) (statement of Rep. Hobbs); see 91 Cong. Rec. 11906 (1945) (statement of Rep. Robsion). In view of the fact that the New York statute applied to a public officer "who asks, or receives, or agrees to receive" unauthorized compensation, N. Y. Penal Code § 557 (1881), the reference to New York law is consistent with an intent to apply the common-law definition. The language of the New York statute quoted above makes clear that extortion could be committed by one who merely *received* an unauthor-

---

[13] Several States had already defined the offense of extortion broadly enough to include the conduct of the private individual as well as the conduct of the public official. See, *e. g., United States* v. *Nardello*, 393 U. S. 286, 289 (1969) ("In many States . . . the crime of extortion has been statutorily expanded to include acts by private individuals under which property is obtained by means of force, fear, or threats"); *Bush* v. *State*, 19 Ariz. 195, 198, 168 P. 508, 509–510 (1917) (recognizing that the state Penal Code "has enlarged the scope of this offense so as not to confine the commission of it to those persons who act under color of official right"); *People* v. *Peck*, 43 Cal. App. 638, 643, 185 P. 881, 882–883 (1919) (In some States "the statutory definitions have extended the scope of the offense beyond that of the common law so as to include the unlawful taking of money or thing of value of another by any person, whether a public officer or a private individual, and this is so in California . . .").

At least one commentator has argued that, at common law, extortion under color of official right could also be committed by a private individual. See Lindgren 875.

ized payment.[14]  This was the statute that was in force in New York when the Hobbs Act was enacted.

The two courts that have disagreed with the decision to apply the common-law definition have interpreted the word "induced" as requiring a wrongful use of official power that "begins with the public official, not with the gratuitous actions of another." *United States* v. *O'Grady,* 742 F. 2d, at 691; see *United States* v. *Aguon,* 851 F. 2d, at 1166 (" 'inducement' can be in the overt form of a 'demand,' or in a more subtle form such as 'custom' or 'expectation' "). If we had no common-law history to guide our interpretation of the statutory text, that reading would be plausible. For two reasons, however, we are convinced that it is incorrect.

First, we think the word "induced" is a part of the definition of the offense by the private individual, but not the offense by the public official. In the case of the private individual, the victim's consent must be "induced by wrongful use of actual or threatened force, violence or fear." In the case of the public official, however, there is no such requirement. The statute merely requires of the public official that he obtain "property from another, with his consent, . . . under color of official right." The use of the word "or" before "under color of official right" supports this reading.[15]

---

[14] Many of the treatise writers explained that, at common law, extortion was defined as the corrupt taking or receipt of an unlawful fee by a public officer under color of office. They did not allude to any requirements of "inducement" or "demand" by a public officer. See, *e. g.,* W. LaFave & A. Scott, Handbook on Criminal Law § 95, p. 704 (1972); R. Perkins & R. Boyce, Criminal Law 448 (1982); 4 C. Torcia, Wharton's Criminal Law § 695, p. 481, § 698, p. 484 (14th ed. 1981).

[15] This meaning would, of course, have been completely clear if Congress had inserted the word "either" before its description of the private offense because the word "or" already precedes the description of the public offense. The definition would then read: "The term 'extortion' means the obtaining of property from another, with his consent, *either* induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right."

Second, even if the statute were parsed so that the word "induced" applied to the public officeholder, we do not believe the word "induced" necessarily indicates that the transaction must be *initiated* by the recipient of the bribe. Many of the cases applying the majority rule have concluded that the wrongful acceptance of a bribe establishes all the inducement that the statute requires.[16] They conclude that the coercive element is provided by the public office itself. And even the two courts that have adopted an inducement requirement for extortion under color of official right do not require proof that the inducement took the form of a threat or demand. See *United States* v. *O'Grady,* 742 F. 2d, at 687; *United States* v. *Aguon,* 851 F. 2d, at 1166.[17]

---

[16] See, *e. g., United States* v. *Holzer,* 816 F. 2d 304, 311 (CA7), vacated on other grounds, 484 U. S. 807 (1987), aff'd in part on remand, 840 F. 2d 1343 (CA7), cert. denied, 486 U. S. 1035 (1988); *United States* v. *Paschall,* 772 F. 2d 68, 72–74 (CA4 1985); *United States* v. *Williams,* 621 F. 2d, at 124; *United States* v. *Butler,* 618 F. 2d, at 418.

[17] Moreover, we note that while the statute does not require that affirmative inducement be proven as a distinct element of the Hobbs Act, there is evidence in the record establishing that petitioner received the money with the understanding that he would use his office to aid the bribegiver. Petitioner and the agent had several exchanges in which they tried to clarify their understanding with each other. For example, petitioner said to the agent: "I understand both of us are groping . . . for what we need to say to each other. . . . I'm gonna work. Let m[e] tell you I'm gonna work, if you didn't give me but three [thousand dollars], on this, I've promised to help you. I'm gonna work to do that. You understand what I mean. . . . If you gave me six, I'll do exactly what I said I was gonna do for you. If you gave me one, I'll do exactly what I said I was gonna do for you. I wanna' make sure you're clear on that part. So it doesn't really matter. If I promised to help, that's what I'm gonna do." App. 36–37.

Petitioner instructed the agent on the form of the payment ("What you do, is make me out one, ahh, for a thousand. . . . And, and that means we gonna record it and report it and then the rest would be cash"), and agreed with the agent that the payment was being made, not because it was an election year, but because there was a budget to support petitioner's ac-

Petitioner argues that the jury charge with respect to extortion, see *supra*, at 257–258, allowed the jury to convict him on the basis of the "passive acceptance of a contribution." Brief for Petitioner 24.[18] He contends that the instruction did not require the jury to find "an element of du-

---

tions, and that there would be a budget either way ("Either way, yep. Oh, I understand that. I understand"). *Id.*, at 38.

[18] Petitioner also makes the point that "[t]he evidence at trial against [petitioner] is more conducive to a charge of bribery than one of extortion." Brief for Petitioner 40. Although the evidence in this case may have supported a charge of bribery, it is not a defense to a charge of extortion under color of official right that the defendant could also have been convicted of bribery. Courts addressing extortion by force or fear have occasionally said that extortion and bribery are mutually exclusive, see, *e. g.*, *People* v. *Feld*, 262 App. Div. 909, 28 N. Y. S. 2d 796, 797 (1941); while that may be correct when the victim was intimidated into making a payment (extortion by force or fear), and did not offer it voluntarily (bribery), that does not lead to the conclusion that extortion under color of official right and bribery are mutually exclusive under either common law or the Hobbs Act. See, *e. g.*, Stern, Prosecutions of Local Political Corruption Under the Hobbs Act: The Unnecessary Distinction Between Bribery and Extortion, 3 Seton Hall L. Rev. 1, 14 (1971) ("If the [Hobbs] Act is read in full, the distinction between bribery and extortion becomes unnecessary where public officials are involved").

Another commentator has argued that bribery and extortion were overlapping crimes, see Lindgren 905, 908, and has located an early New York case in which the defendant was convicted of both bribery and extortion under color of official right, see *People* v. *Hansen*, 241 N. Y. 532, 150 N. E. 542 (1925), aff'g, 211 App. Div. 861, 207 N. Y. S. 894 (1924). He also makes the point that the cases usually cited for the proposition that extortion and bribery are mutually exclusive crimes are cases involving extortion by fear and bribery, see, *e. g.*, *People* v. *Feld, supra; People* v. *Dioguardi*, 8 N. Y. 2d 260, 263, 271–273, 168 N. E. 2d 683, 685, 690–692 (1960), and we note that the latter case was decided after the Hobbs Act, so it could not have been a case on which Congress relied. We agree with the Seventh Circuit in *United States* v. *Braasch*, 505 F. 2d 139, 151, n. 7 (1974), cert. denied, 421 U. S. 910 (1975), that "'the modern trend of the federal courts is to hold that bribery and extortion as used in the Hobbs Ac[t] are not mutually exclusive. *United States* v. *Kahn*, 472 F. 2d 272, 278 (2d Cir. 1973), cert. den., 411 U. S. 982.'"

ress such as a demand," *id.*, at 22, and it did not properly describe the *quid pro quo* requirement for conviction if the jury found that the payment was a campaign contribution.

We reject petitioner's criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of *McCormick* v. *United States*, 500 U. S. 257 (1991), because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense. We also reject petitioner's contention that an affirmative step is an element of the offense of extortion "under color of official right" and need be included in the instruction.[19] As we explained above, our construction of the statute is informed by the common-law tradition from which the term of art was drawn and understood. We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.[20]

Our conclusion is buttressed by the fact that so many other courts that have considered the issue over the last 20 years have interpreted the statute in the same way.[21] Moreover,

---

[19] We do not reach petitioner's second claim pertaining to the tax fraud count because, as petitioner conceded at oral argument, we would only have to reach that claim in the event that petitioner succeeded on his Hobbs Act claim. See Tr. of Oral Arg. 3–4, 27.

[20] The dissent states that we have "simply made up," *post*, at 286, the requirement that the payment must be given in return for official acts. On the contrary, that requirement is derived from the statutory language "under color of official right," which has a well-recognized common-law heritage that distinguished between payments for private services and payments for public services. See, *e. g.*, *Collier* v. *State*, 55 Ala. 125 (1877), which the dissent describes as a "typical case." *Post*, at 281.

[21] See, *e. g.*, *United States* v. *Swift*, 732 F. 2d 878, 880 (CA11 1984), cert. denied, 469 U. S. 1158 (1985); *United States* v. *Jannotti*, 673 F. 2d, at 594–596; *United States* v. *French*, 628 F. 2d, at 1074; *United States* v. *Williams*, 621 F. 2d, at 123–124; *United States* v. *Butler*, 618 F. 2d, at 417–418; *United States* v. *Hall*, 536 F. 2d, at 320–321; *United States* v. *Hathaway*, 534 F.

given the number of appellate court decisions, together with the fact that many of them have involved prosecutions of important officials well known in the political community,[22] it is obvious that Congress is aware of the prevailing view that common-law extortion is proscribed by the Hobbs Act. The silence of the body that is empowered to give us a "contrary direction" if it does not want the common-law rule to survive is consistent with an application of the normal presumption identified in *Taylor* and *Morissette.*

### III

An argument not raised by petitioner is now advanced by the dissent. It contends that common-law extortion was *limited* to wrongful takings under a false pretense of official right. *Post,* at 279–280; see *post,* at 281 (offense of extortion "was understood . . . [as] a wrongful taking *under a false pretense of official right*") (emphasis in original); *post,* at 282. It is perfectly clear, however, that although extortion accomplished by fraud was a well-recognized type of extortion, there were other types as well. As the court explained in *Commonwealth* v. *Wilson,* 30 Pa. Super. 26 (1906), an extortion case involving a payment by a would-be brothel owner to a police captain to ensure the opening of her house:

> "The form of extortion most commonly dealt with in the decisions is the corrupt taking by a person in office of a

2d, at 393–394; *United States* v. *Price,* 507 F. 2d 1349 (CA4 1974); *United States* v. *Braasch,* 505 F. 2d, at 151.

[22] For example, in *United States* v. *Hall, supra,* the Governor of Oklahoma was convicted of extorting money "under color of official right," in violation of the Hobbs Act; in *United States* v. *Kenny,* 462 F. 2d 1205, 1211 (CA3 1972), each of the eight defendants, who was part of a scheme to interfere with interstate commerce in violation of the Hobbs Act, "was, or had been, a highly placed public official or political leader in Jersey City or Hudson County or both"; and in *United States* v. *Jannotti,* 673 F. 2d, at 578, the Government operation, which came to be known as ABSCAM, led to the trial and conviction of various local and federal public officials, which, in other phases of the operation, included several Congressmen.

fee for services which should be rendered gratuitously; or when compensation is permissible, of a larger fee than the law justifies, or a fee not yet due; but this is not a complete definition of the offense, by which I mean that it does not include every form of common-law extortion." *Id.*, at 30.

See also *Commonwealth* v. *Brown*, 23 Pa. Super. 470, 488–489 (1903) (defendants charged with and convicted of conspiracy to extort because they accepted pay for obtaining and procuring the election of certain persons to the position of schoolteachers); *State* v. *Sweeney*, 180 Minn. 450, 456, 231 N. W. 225, 228 (1930) (alderman's acceptance of money for the erection of a barn, the running of a gambling house, and the opening of a filling station would constitute extortion) (dicta); *State* v. *Barts*, 132 N. J. L. 74, 76, 83, 38 A. 2d 838, 841, 844 (Sup. Ct. 1944) (police officer, who received $1,000 for not arresting someone who had stolen money, was properly convicted of extortion because "generically extortion is an abuse of public justice and a misuse by oppression of the power with which the law clothes a public officer"); *White* v. *State*, 56 Ga. 385, 389 (1876) (If a ministerial officer used his position "for the purpose of awing or seducing" a person to pay him a bribe that would be extortion).

The dissent's theory notwithstanding, not one of the cases it cites, see *post*, at 281–282, and n. 3, holds that the public official is innocent unless he has deceived the payor by representing that the payment was proper. Indeed, none makes any reference to the state of mind of the payor, and none states that a "false pretense" is an element of the offense. Instead, those cases merely support the proposition that the services for which the fee is paid must be official and that the official must not be entitled to the fee that he collected— both elements of the offense that are clearly satisfied in this case. The complete absence of support for the dissent's thesis presumably explains why it was not advanced by petitioner in the District Court or the Court of Appeals, is not

recognized by any Court of Appeals, and is not advanced in any scholarly commentary.[23]

The judgment is affirmed.

*It is so ordered.*

---

[23] Moreover, the dissent attempts to have it both ways in its use of common-law history. It wants to draw an artificial line and say that we should only look at American common law and not at the more ancient English common law (even though the latter provided the roots for the former), see *post*, at 280–281, and at the same time, it criticizes the Court for relying on a "'modern' view of extortion," *post*, at 285–286, n. 4; it also uses a 1961 case, which was decided 15 years *after* the enactment of the Hobbs Act, to explain the American view of the common-law crime of extortion at the time of the Act, see *ibid.*, even though it claims that we are only supposed to look at "the American understanding of the crime at the time the Hobbs Act was passed in 1946." *Post*, at 281. Moreover, the 1961 case that it cites, *State* v. *Begyn*, 34 N. J. 35, 46, 167 A. 2d 161, 166, in which a sanitary inspector was charged with extortion for accepting payments by a scavenger who held a garbage removal contract and who made payments in order to ensure the continuation of the contract, merely supports the proposition that extortion was not limited to the overpayment of fees. The common-law crime of extortion was broader than the dissent now attempts to paint it, and in any of the historical periods to which the dissent wants to point there are cases that are contrary to the dissent's narrow view. For "modern" cases, see *Begyn, supra,* and *State* v. *Barts*, 132 N. J. L. 74, 38 A. 2d 838 (1944); for early American common-law cases, see *supra*, at 269–270; and for English common-law cases, see, *e. g.*, 36 Lincoln Record Society, A Lincolnshire Assize Roll for 1298, p. 74, no. 322 (W. Thomson ed. 1944) (Adam of Lung (1298)) (was convicted of extortion for accepting payment to spare a man from having to contribute to an official collection of a quantity of malt); 10 Calendar of Patent Rolls, Edward III, A. D. 1354–1358, p. 449 (1909) (Hugh de Elmeshale (1356)) (coroner would not perform his "office without great ransoms and that he used to extort money from the people by false and feigned indictments"); Calendar of Patent Rolls, Edward II, A. D. 1313–1317, pp. 681–682 (1898) (Robert de Somery (1317)) (Robert de Somery, commissioner of array for Worcester received money from men "in order that by his connivance they might escape service and remain at home"); 1 Middlesex County Records (Old Series) 69 (J. Jeaffreson ed. 1886) (Smythe (1570)) (one of Queen Elizabeth's providers of wagons for ale and beer "by color of his office took extortionately" payments from the wagon owners to exonerate them from their obligations to the Queen).

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion, because in my view they correctly answer the question on which the Court granted certiorari—whether or not an act of inducement is an element of the offense of extortion under color of official right. See Pet. for Cert. i. The issue raised by the dissent and discussed in Part III of the Court's opinion is not fairly included in this question, see this Court's Rule 14.1(a), and sound prudential reasons suggest that the Court should not address it. Cf. *Yee* v. *Escondido*, 503 U. S. 519, 535–538 (1992). Neither party in this case has briefed or argued the question. A proper resolution of the issue requires a detailed examination of common law extortion cases, which in turn requires intensive historical research. As there appear to be substantial arguments on either side, we would be far more assured of arriving at the correct result were we to await a case in which the issue had been addressed by the parties. It is unfair to the United States to decide a case on a ground not raised by the petitioner and which the United States has had no opportunity to address. For these reasons, I join neither the dissent nor Part III of the Court's opinion, and I express no view as to which is correct.

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

The Court gives a summary of its decision in these words: "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Ante,* at 268. In my view the dissent is correct to conclude that this language requires a *quid pro quo* as an element of the Government's case in a prosecution under 18 U. S. C. § 1951, see *post,* at 285–287, and the Court's opinion can be interpreted in a way that is consistent with this rule. Although the Court appears to accept the re-

quirement of a *quid pro quo* as an alternative rationale, in my view this element of the offense is essential to a determination of those acts which are criminal and those which are not in a case in which the official does not pretend that he is entitled by law to the property in question. Here the prosecution did establish a *quid pro quo* that embodied the necessary elements of a statutory violation. I join Part III of the Court's opinion and concur in the judgment affirming the conviction. I write this separate opinion to explain my analysis and understanding of the statute.

With regard to the question whether the word "induced" in the statutory definition of extortion applies to the phrase "under color of official right," 18 U. S. C. § 1951(b)(2), I find myself in substantial agreement with the dissent. Scrutiny of the placement of commas will not, in the final analysis, yield a convincing answer, and we are left with two quite plausible interpretations. Under these circumstances, I agree with the dissent that the rule of lenity requires that we avoid the harsher one. See *post,* at 289. We must take as our starting point the assumption that the portion of the statute at issue here defines extortion as "the obtaining of property from another, with his consent, induced . . . under color of official right."

I agree with the Court, on the other hand, that the word "induced" does not "necessarily indicat[e] that the transaction must be *initiated* by the" public official. *Ante,* at 266 (emphasis in original). Something beyond the mere acceptance of property from another is required, however, or else the word "induced" would be superfluous. That something, I submit, is the *quid pro quo.* The ability of the official to use or refrain from using authority is the "color of official right" which can be invoked in a corrupt way to induce payment of money or to otherwise obtain property. The inducement generates a *quid pro quo,* under color of official right, that the statute prohibits. The term "under color of" is used, as I think both the Court and the dissent agree, to

sweep within the statute those corrupt exercises of authority that the law forbids but that nevertheless cause damage because the exercise is by a governmental official. Cf. *Monroe* v. *Pape*, 365 U. S. 167, 184 (1961) ("'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law'") (quoting *United States* v. *Classic*, 313 U. S. 299, 326 (1941)).

The requirement of a *quid pro quo* means that without pretense of any entitlement to the payment, a public official violates § 1951 if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied. The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

The criminal law in the usual course concerns itself with motives and consequences, not formalities. And the trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor. See *McCormick* v. *United States*, 500 U. S. 257, 270 (1991) ("It goes without saying that matters of intent are for the jury to consider"). In this respect a prosecution under the statute has some similarities to a contract dispute, with the added and vital element that motive is crucial. For example, a *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct. Cf. *United States* v. *O'Grady*, 742 F. 2d 682, 694 (CA2 1984) (Pierce, J., concurring). In such instances, for a public official to commit extortion under color of official right, his course of dealings must establish a real understanding that failure to make

a payment will result in the victimization of the prospective payor or the withholding of more favorable treatment, a victimization or withholding accomplished by taking or refraining from taking official action, all in breach of the official's trust. See Lindgren, The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815, 887–888 (1988) (observing that the offense of official extortion has always focused on public corruption).

Thus, I agree with the Court, that the *quid pro quo* requirement is not simply made up, as the dissent asserts. *Post*, at 287. Instead, this essential element of the offense is derived from the statutory requirement that the official receive payment under color of official right, see *ante*, at 268, n. 20, as well as the inducement requirement. And there are additional principles of construction which justify this interpretation. First is the principle that statutes are to be construed so that they are constitutional. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988), and cases cited therein. As one Court of Appeals Judge who agreed with the construction the Court today adopts noted, "the phrase 'under color of official right,' standing alone, is vague almost to the point of unconstitutionality." *United States* v. *O'Grady, supra*, at 695 (Van Graafeiland, J., concurring in part and dissenting in part) (citing *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498–499 (1982)). By placing upon a criminal statute a narrow construction, we avoid the possibility of imputing to Congress an enactment that lacks necessary precision.

Moreover, the mechanism which controls and limits the scope of official right extortion is a familiar one: a state of mind requirement. See *Morissette* v. *United States*, 342 U. S. 246 (1952) (refusing to impute to Congress the intent to create a strict liability crime despite the absence of any explicit *mens rea* requirement in the statute). Hence, even

if the *quid pro quo* requirement did not have firm roots in the statutory language, it would constitute no abuse of judicial power for us to find it by implication.

*Morissette* legitimates the Court's decision in an additional way. As both the Court and the dissent agree, compare *ante*, at 260, n. 4, with *post*, at 288, n. 5, Congress' choice of the phrase "under color of official right" rather than "by colour of his office" does not reflect a substantive modification of the common law. Instead, both the Court and dissent conclude that the language at issue here must be interpreted in light of the familiar principle that absent any indication otherwise, Congress meant its words to be interpreted in light of the common law. *Morissette, supra,* at 263. As to the meaning of the common law, I agree with the Court's analysis and therefore join Part III of the Court's opinion.

While the dissent may well be correct that prior to the enactment of the Hobbs Act a large number of the reported official extortion cases in the United States happened to involve false pretenses, those cases do not so much as hint that a false pretense of right was ever considered as an essential element of the offense. See, *e. g., People* v. *Whaley,* 6 Cow. 661, 663–664 (N. Y. Sup. Ct. 1827) ("Extortion signifies, in an enlarged sense, any oppression under color of right. In a stricter sense, it signifies the taking of money by any officer, by color of his office; either, where none at all is due, or not so much due, or when it is not yet due"); *Hanley* v. *State,* 125 Wis. 396, 401–402, 104 N. W. 57, 59 (1905) ("The common-law offense of extortion is said 'to be an abuse of public justice, which consists in any officer's unlawfully taking by color of his office, from any man, any money or thing of value that is not due him, or more than is due him, or before it is due'") (quoting 4 W. Blackstone, Commentaries *141). Furthermore, as the Court demonstrates, see *ante*, at 269–270, during the same period other American courts affirmed convictions of public officials for extortion based upon corrupt receipt of payment absent any claim of right.

*Morissette* is relevant in one final respect. As I have indicated, and as the jury instructions in this case made clear, an official violates the statute only if he agrees to receive a payment not due him in exchange for an official act, knowing that he is not entitled to the payment. See App. 13 (requiring "wrongful use of otherwise valid official power"). Modern courts familiar with the principle that only a clear congressional statement can create a strict liability offense, see *Morissette, supra,* understand this fundamental limitation. I point it out only because the express terms of the common-law definition of official extortion do not state the requirement that the official's intent be corrupt, see, *e. g., Whaley, supra,* at 663–664; *Hanley, supra,* at 401–402, 104 N. W., at 59; Lindgren, 35 UCLA L. Rev., at 870–871 (setting forth six colonial-era definitions of official extortion), and some courts in this country appear to have taken the view that the common-law offense had no *mens rea* requirement. See, *e. g., Commonwealth* v. *Bagley,* 24 Mass. 279, 281 (1828) (affirming the conviction "of an honest and meritorious public officer, who by misapprehension of his rights [had] demanded and received a lawful fee for a service not yet performed"). On the other hand, in other jurisdictions corrupt motive was thought to be an element of the offense. *E. g., Whaley, supra,* at 664 (remarking that the jury found that the defendant accepted payment "with the corrupt intent charged in the indictment"). In any event, even if the rule had been otherwise at common law, our modern jurisprudence would require that there be a *mens rea* requirement now. In short, a public official who labors under the good-faith but erroneous belief that he is entitled to payment for an official act does not violate the statute. That circumstance is not, however, presented here.

The requirement of a *quid pro quo* in a § 1951 prosecution such as the one before us, in which it is alleged that money was given to the public official in the form of a campaign contribution, was established by our decision last Term in

*McCormick* v. *United States*, 500 U. S. 257 (1991). Readers of today's opinion should have little difficulty in understanding that the rationale underlying the Court's holding applies not only in campaign contribution cases, but in all § 1951 prosecutions. That is as it should be, for, given a corrupt motive, the *quid pro quo*, as I have said, is the essence of the offense.

Because I agree that the jury instruction in this case complied with the *quid pro quo* requirement, I concur in the judgment of the Court.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Court's analysis is based on the premise, with which I fully agree, that when Congress employs legal terms of art, it " 'knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind.' " *Ante,* at 259 (quoting *Morissette* v. *United States,* 342 U. S. 246, 263 (1952)). Thus, we presume, Congress knew the meaning of common-law extortion when it enacted the Hobbs Act, 18 U. S. C. § 1951. Unfortunately, today's opinion misapprehends that meaning and misconstrues the statute. I respectfully dissent.

I

Extortion is one of the oldest crimes in Anglo-American jurisprudence. See 3 E. Coke, Institutes *541. Hawkins provides the classic common-law definition: "[I]t is said, that Extortion in a large Sense signifies any Oppression *under Colour of Right;* but that in a strict Sense it signifies the Taking of Money by any Officer, *by Colour of his Office,* either where none at all is due, or not so much is due, or where it is not yet due." 1 W. Hawkins, Pleas of the Crown 170 (2d ed. 1724) (emphasis added). Blackstone echoed that definition: "[E]xtortion is an abuse of public justice, which

consists in any officer's unlawfully taking, *by colour of his office*, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." 4 W. Blackstone, Commentaries 141 (1769) (emphasis added).

These definitions pose, but do not answer, the critical question: What does it mean for an official to take money "by colour of his office"? The Court fails to address this question, simply assuming that common-law extortion encompassed *any* taking by a public official of something of value that he was not "due." *Ante,* at 260.

The "under color of office" element of extortion, however, had a definite and well-established meaning at common law. "At common law it was essential that the money or property be obtained under color of office, *that is, under the pretense that the officer was entitled thereto by virtue of his office.* The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority." 3 R. Anderson, Wharton's Criminal Law and Procedure § 1393, pp. 790–791 (1957) (emphasis added).[1] Thus, although the Court purports to

---

[1] That was straightforward black-letter law at the time the Hobbs Act was passed in 1946, and continues to be straightforward black-letter law today. See, *e. g.,* 1 W. Burdick, Law of Crime § 275, p. 395 (1946) ("At common law, the money or other thing of value must be taken under color of office. That is, the service rendered, or to be rendered, or pretended to have been rendered, must be apparently, or pretended to be, *within official power or authority, and the money must be taken in such an apparent or claimed capacity*") (emphasis added; footnotes omitted); 31A Am. Jur. 2d § 11, p. 600 (1989) ("In order to constitute extortion, the taking must take place under color of office—that is, *under the pretense that the officer is entitled to the fee by virtue of his or her office.* This requires that the service rendered must be apparently, or pretended to be, within official power or authority, and the money *must be taken in such apparent or claimed authority*") (emphasis added; footnotes omitted). Cf. 7 Cyclopedia of Law and Procedure 401–402 (1903) (defining "color of office" as "a pretense of official right to do an act made by one who has no such right; the mere semblance, shadow, or false appearance of official authority; the dissembling face of the right of office; the use of official authority as a

define official extortion under the Hobbs Act by reference to the common law, its definition bears scant resemblance to the common-law crime Congress presumably codified in 1946.

A

The Court's historical analysis rests upon a theory set forth in one law review article. See *ante*, at 260, and nn. 4–6 (citing Lindgren, The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815 (1988)). Focusing on early English cases, the article argues that common-law extortion encompassed a wide range of official takings, whether by coercion, false pretenses, or bribery. Whatever the merits of that argument as a description of early English common law,[2] it is

---

pretext or cover for the commission of some corrupt or vicious act; an act evilly done, by the countenance of an office; an act unjustly done by the countenance of an office; an act wrongfully done by an officer under the pretended authority of his office; and is always taken in the worst sense, being grounded upon corruption, of which the office is as a mere shadow or color; under statutes, the phrase is used to define an illegal claim of right or authority to take the security; some illegal exertion of authority, whereby an obligation is extorted which the statute does not require to be given") (footnotes omitted).

[2] Those merits are far from clear. Most commentators maintain that extortion and bribery were distinct crimes at early English common law. See, *e. g.*, J. Noonan, Bribes 398, 585–587 (1984); Ruff, Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy, 65 Geo. L. J. 1171, 1179–1180 (1977). While—as I explain below— Professor Lindgren may well be correct that common-law extortion did not contain an "inducement" element, in my view he does not adequately account for the crime's "by color of office" element. This latter element has existed since long before the founding of the Republic, and cannot simply be ignored. As Chief Justice Mountague explained over four centuries ago, *colore officii sui* ("by color of his office") "signifies an Act badly done *under the Countenance of an Office*, and it bears *a dissembling Visage of Duty*, and is properly called Extortion." *Dive* v. *Maningham*, 1 Plowd. 60, 68, 75 Eng. Rep. 96, 108 (C. B. 1550) (emphasis added). See also 3 E. Coke, Institutes *542 (describing extortion as "more odious than

beside the point here—the critical inquiry for our purposes is the American understanding of the crime at the time the Hobbs Act was passed in 1946. Cf. *Harmelin* v. *Michigan*, 501 U. S. 957, 975 (1991) (plurality opinion) (English historical background is relevant in determining the meaning of a constitutional provision, but the "ultimate question" is the meaning of that provision to the Americans who adopted it).

A survey of 19th- and early 20th-century cases construing state extortion statutes in light of the common law makes plain that the offense was understood to involve not merely a wrongful taking by a public official, but a wrongful taking *under a false pretense of official right.* A typical case is *Collier* v. *State*, 55 Ala. 125 (1877). The defendant there was a local prosecutor who, for a fee, had given legal advice to a criminal suspect. The Alabama Supreme Court rejected the State's contention that the defendant's receipt of the fee—even though improper—amounted to "extortion," because he had not taken the money "under color of his office." "The object of the [extortion] statute is . . . not the obtaining money by mere impropriety of conduct, or by fraud, by persons filling official position." *Id.*, at 127. Rather, the court explained, "[a] taking under color of office is of the essence of the offense. *The money or thing received must have been claimed, or accepted, in right of office, and the person paying must have been yielding to official authority.*" *Id.*, at 128 (emphasis added). That a public official took money he was not due was not enough. "[T]hough the defendant may have been guilty of official infidelity, the wrong was to the State only, and no wrong was done the person paying the money. That wrong is not punishable under this indictment. Private and public wrong must concur, to constitute

robbery; for robbery is apparent, and hath the face of a crime, but *extortion puts on the visure of virtue*") (emphasis added).

extortion." *Ibid.* Numerous decisions from other juris-
dictions confirm that an official obtained a payment "under
color of his office" only—as the phrase suggests—when he
used the office to assert a false pretense of official right to
the payment.[3]

Because the Court misapprehends the "color of office" re-
quirement, the crime it describes today is not the common-
law crime that Congress presumably incorporated into the
Hobbs Act. The explanation for this error is clear. The

---

[3] See, *e. g., People* v. *Whaley,* 6 Cow. 661 (N. Y. Sup. Ct. 1827) (affirming
the extortion conviction of a justice of the peace who had charged a litigant
a court fee when none was due); *Commonwealth* v. *Bagley,* 24 Mass. 279,
281 (1828) (affirming the extortion conviction of a deputy jailkeeper who
had demanded and received a fee when none was due); *State* v. *Stotts,* 5
Black. 460, 460–461 (Ind. 1840) (affirming the extortion conviction of a
constable who had charged a greater fee than was due for performance of
his services); *State* v. *Burton,* 3 Ind. 93, 93–95 (1851) (affirming the extor-
tion conviction of a county treasurer who had charged a fee for his services
where none was due); *Williams* v. *State,* 34 Tenn. 160, 162 (1854) (affirming
the extortion conviction of a county constable who had charged a fee for
official services that he did not perform); *State* v. *Vasel,* 47 Mo. 416, 417–
418 (1871) (affirming the extortion conviction of a deputy constable who
had wrongfully collected a fee before it was legally due); *Cutter* v. *State,*
36 N. J. L. 125, 128 (1873) (reversing the extortion conviction of a justice
of the peace who had charged for his services a fee to which he was not
entitled, but may have done so under a mistaken belief of right); *Loftus* v.
*State,* 19 A. 183, 184 (N. J. Ct. Err. App. 1890) (affirming the extortion
conviction of a justice of the peace who had charged an excessive fee for
his services); *Commonwealth* v. *Saulsbury,* 152 Pa. 554, 559–560, 25 A.
610, 611–612 (1893) (reversing, on evidentiary grounds, the extortion con-
viction of a deputy constable who had charged an excessive fee for his
services); *Hanley* v. *State,* 125 Wis. 396, 401–402, 104 N. W. 57, 59 (1905)
(affirming the extortion conviction of two constables who wrongfully de-
manded a fee for executing a warrant); *State* v. *Cooper,* 120 Tenn. 549,
552–554, 113 S. W. 1048, 1049 (1908) (reinstating the extortion indictment
of a justice of the peace who had collected a fee as a bail bond before it
was due); *Dean* v. *State,* 9 Ga. App. 303, 305–306, 71 S. E. 597, 598 (1911)
(affirming the extortion conviction of a constable who had used his office
to collect money that he was not due); cf. *La Tour* v. *Stone,* 139 Fla. 681,
693–694, 190 So. 704, 709 (1939) (describing common-law extortion).

Court's historical foray has the single-minded purpose of proving that common-law extortion did *not* include an element of "inducement"; in its haste to reach that conclusion, the Court fails to consider the elements that common-law extortion *did* include. Even if the Court were correct that an official *could* commit extortion at common law simply by receiving (but not "inducing") an unlawful payment, it does not follow either historically or logically that an official *automatically* committed extortion whenever he received such a payment.

The Court, therefore, errs in asserting that common-law extortion is the "rough equivalent of what we would now describe as 'taking a bribe.'" *Ante*, at 260. *Regardless* of whether extortion contains an "inducement" requirement, bribery and extortion are different crimes. An official who solicits or takes a bribe does *not* do so "under color of office"; *i. e.*, under any pretense of official entitlement. "The distinction between bribery and extortion seems to be that the former offense consists in offering a present or receiving one, the latter in *demanding* a fee or present *by color of office.*" *State* v. *Pritchard*, 107 N. C. 921, 929, 12 S. E. 50, 52 (1890) (emphasis added). Where extortion is at issue, the public official is the sole wrongdoer; because he acts "under color of office," the law regards the payor as an innocent victim and not an accomplice. See, *e. g.*, 1 W. Burdick, Law of Crime §§ 273–275, pp. 392–396 (1946). With bribery, in contrast, the payor *knows* the recipient official is not entitled to the payment; he, as well as the official, may be punished for the offense. See, *e. g.*, *id.*, §§ 288–292, at 426–436. Congress is well aware of the distinction between the crimes; it has always treated them separately. Compare 18 U. S. C. § 872 ("*[e]xtortion* by officers or employees of the United States" (emphasis added), which criminalizes extortion by federal officials, and makes no provision for punishment of the payor), with 18 U. S. C. § 201 ("*[b]ribery* of public officials and witnesses" (emphasis added), which criminalizes bribery of and

by federal officials).  By stretching the bounds of extortion
to make it encompass bribery, the Court today blurs the tra-
ditional distinction between the crimes.[4]

---

[4] The Court alleges a "complete absence of support" for the definition of
common-law extortion set forth in this dissent, and cites five American
cases that allegedly support its understanding of the crime.  *Ante,* at 269–
271.  The Court is mistaken on both counts: even a brief perusal of 19th-
and early 20th-century cases, as well as treatises and hornbooks, shows
that my description of the crime is anything but novel, and the cases cited
by the Court in no way support its argument.

The Court first cites two intermediate-court cases from Pennsylvania,
*Commonwealth* v. *Wilson,* 30 Pa. Super. 26 (1906), and *Commonwealth* v.
*Brown,* 23 Pa. Super. 470 (1903).  Those opinions, both written by one
Judge Rice, display an obvious misunderstanding of the meaning of "color
of office."  Citing the definition of that phrase set forth in the Cyclopedia
of Law and Practice, see n. 1, *supra,* the Court confuses a false pretense
of official authority *to receive a payment* with a false pretense of official
authority *to do an official act.*  See *Wilson, supra,* at 31 ("Bribery on the
part of an officer and extortion are not identical, but they are very closely
allied; and whilst the former does not necessarily involve a pretense of
official authority *to do the act for which the bribe is given,* yet, if such
pretense is used *to induce* its payment, we see no reason to doubt that the
taking of it is common-law extortion as well as bribery") (emphasis added).
But, as Hawkins, Blackstone, and all other expositors of black-letter law
make clear, the crux of common-law extortion was the unlawful taking of
money by color of office, *not* the unlawful taking of money to do an act by
color of office.

In any event, the Pennsylvania court's unorthodox understanding of
common-law extortion in no way supports the Court's definition of the
crime, as the Pennsylvania court explicitly required a pretense of author-
ity to *induce* the unlawful payment—precisely the requirement the Court
today rejects.  See also *Commonwealth* v. *Francis,* 201 Pa. Super. 313,
322–323, 191 A. 2d 884, 889 (1963) (citing *Wilson* and *Brown* for the propo-
sition that "the extraction of money or other things of value *under a threat
of using the power of one's office* may constitute extortion" and explaining
that "[a]lthough we have recognized that the crimes of common law extor-
tion and bribery may coincide at times, . . . it is generally held that they
are mutually exclusive crimes") (emphasis added).

The third case cited by the Court, *State* v. *Sweeney,* 180 Minn. 450, 231
N. W. 225 (1930), does not involve extortion at all—it upheld a Minneapolis
alderman's conviction for *bribery.*  At trial on one charge of receiving a

## B

Perhaps because the common-law crime—as the Court defines it—is so expansive, the Court, at the very end of its opinion, appends a qualification: "We hold today that the

bribe, the State introduced evidence that the defendant had received other bribes, some from gambling houses. He challenged the admission of the evidence of other crimes; the court rejected that challenge on evidentiary grounds. In passing, however, the court said: "It may be noted, however, that *it may be* that the defendant and [another alderman], in dealing with the gambling houses, were guilty of extortion under [the state statute]." *Id.*, at 456, 231 N. W., at 228 (emphasis added). That is all. The Court's parenthetical claim that "dicta" in the opinion support the proposition that "alderman's acceptance of money for the erection of a barn, the running of a gambling house, and the opening of a filling station *would* constitute extortion" is, at best, a gross overstatement. *Ante*, at 270.

Fourth, the Court cites *State* v. *Barts*, 132 N. J. L. 74, 76, 83, 38 A. 2d 838, 841, 844 (1944), which upheld the extortion conviction of a police officer, based essentially on a bribery rationale. As the New Jersey Supreme Court has neatly explained, however, that case represented a *departure* from the traditional common law of extortion:

"Our extortion statute, which had its origin at least as early as 1796, appears on its face to have been originally intended to be reiterative of the common law. The essence of that offense was the receiving or taking by any public officer, by color of his office, of any fee or reward not allowed by law for performing his duties. The purpose would seem to be simply *to penalize the officer who non-innocently insisted upon a larger fee than he was entitled to or a fee where none was permitted or required to be paid for the performance of an obligatory function of his office.* The matter was obviously of particular importance in the days when public officials received their compensation through fees collected and not by fixed salary. Our early cases dealt with precisely this kind of a situation. [Citing, *inter alia, Cutter* v. *State* and *Loftus* v. *State*, see n. 3, *supra*].

"After a couple of opinions possibly indicating an extension to cover payments demanded for the favorable exercise of discretionary powers of the officer, *an enlarged construction of the statute to its present day scope* was announced in *State* v. *Barts* . . . . This *present* construction of the crime thus overlaps the offense of bribery since extortion is committed even where the object of the payment is in reality to influence an officer in his official behavior or conduct without such having to be established." *State* v. *Begyn*, 34 N. J. 35, 46–47, 167 A. 2d 161, 166–167 (1961) (emphasis added; citations omitted). If the Court wishes to adopt the "modern"

Government need only show that a public official has obtained a payment to which he was not entitled, *knowing that the payment was made in return for official acts.*" *Ante,* at 268 (emphasis added). This *quid pro quo* requirement is simply made up. The Court does not suggest that it has any basis in the common law or the language of the Hobbs Act, and I have found no treatise or dictionary that refers to any such requirement in defining "extortion."

Its only conceivable source, in fact, is our opinion last Term in *McCormick* v. *United States,* 500 U. S. 257 (1991). Quite sensibly, we insisted in that case that, unless the Government established the existence of a *quid pro quo,* a public official could not be convicted of extortion under the Hobbs Act for accepting a campaign contribution. We did not purport to discern that requirement in the common law or statutory text, but imposed it to prevent the Hobbs Act from effecting a radical (and absurd) change in American political life. "To

---

view of extortion, fine; but it should not attempt to present that view as "common-law history."

Finally, the Court cites *White* v. *State,* 56 Ga. 385 (1876). There the Georgia Supreme Court reversed the extortion conviction of a special constable who was charged with improperly keeping a fee that he had collected. The court first explained that a transaction was *not* extortion if the defendant "took the money in good faith, *without any claim to it.*" *Id.,* at 389 (emphasis added). The court then went on, in dicta, to assert that if an officer "should use his authority, or any process of law in his hands, for the purpose of *awing or seducing* any person into paying him a bribe, that would, doubtless, be extortion." *Ibid.* (emphasis added). For this latter proposition the Georgia court cited no authority. The court's error is manifest: it confused the common-law meaning of extortion (an officer wrongfully taking money under color of his office) with the colloquial meaning of the term (which conjures up coercion, and thus is at once broader and narrower than the common law). To the extent that *White*'s dicta cuts against my understanding of common-law extortion, of course, it cuts equally strongly against the Court's, for, like the Pennsylvania cases cited earlier in this footnote, it quite obviously requires that the extorted payment be "induced" by the officer—the very requirement the Court today rejects.

hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion." *Id.*, at 272–273. We expressly limited our holding to campaign contributions. *Id.*, at 274, n. 10 ("[W]e do not decide whether a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value").

Because the common-law history of extortion was neither properly briefed nor argued in *McCormick*, see *id.*, at 268, n. 6; *id.*, at 276–277 (SCALIA, J., concurring), the *quid pro quo* limitation imposed there represented a reasonable first step in the right direction. Now that we squarely consider that history, however, it is apparent that that limitation was in fact overly modest: at common law, McCormick was innocent of extortion *not* because he failed to offer a *quid pro quo* in return for campaign contributions, but because he did not take the contributions under color of official right. Today's extension of *McCormick*'s reasonable (but textually and historically artificial) *quid pro quo* limitation to *all* cases of official extortion is both unexplained and inexplicable—except insofar as it may serve to rescue the Court's definition of extortion from substantial overbreadth.

## II

As serious as the Court's disregard for history is its disregard for well-established principles of statutory construction. The Court chooses not only the harshest interpretation of a criminal statute, but also the interpretation that maximizes federal criminal jurisdiction over state and local officials. I would reject both choices.

## A

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, *induced* by wrongful use of actual or threatened force, violence, or fear, or *under color of official right.*" 18 U. S. C. § 1951(b)(2) (emphasis added).[5] Evans argues, in part, that he did not "induce" any payment. The Court rejects that argument, concluding that the verb "induced" applies *only* to the first portion of the definition. *Ante,* at 265. Thus, according to the Court, the statute should read: "'The term "extortion" means the obtaining of property from another, with his consent, *either* [1] induced by wrongful use of actual or threatened force, violence, or fear, *or* [2] under color of official right.'" *Ante,* at 265, n. 15. That is, I concede, a *conceivable* construction of the words. But it is—at the very least—forced, for it sets up an unnatural and ungrammatical parallel between the *verb* "induced" and the *preposition* "under."

The more natural construction is that the verb "induced" applies to *both* types of extortion described in the statute. Thus, the unstated "either" belongs *after* "induced": "The term 'extortion' means the obtaining of property from another, with his consent, induced *either* [1] by wrongful use of actual or threatened force, violence, or fear, *or* [2] under color of official right." This construction comports with correct grammar and standard usage by setting up a parallel between two prepositional phrases, the first beginning with "by"; the second with "under."[6]

---

[5] I have no quarrel with the Court's suggestion, see *ante* at 260, n. 4, that there is no difference of substance between the classic common-law phrase "by colour of his office" and the Hobbs Act's formulation "under color of official right." The Act's formulation, of course, only underscores extortion's essential element of a false assertion of *official right* to a payment.

[6] This is, moreover, the construction long espoused by the Justice Department. See U. S. Dept. of Justice, United States Attorneys' Manual § 9–131.180 (1984) ("[T]here is some question as to whether the Hobbs Act

Our duty in construing this criminal statute, then, is clear: "The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally* v. *United States*, 483 U. S. 350, 359–360 (1987). See also *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.). Because the Court's expansive interpretation of the statute is not the only plausible one, the rule of lenity compels adoption of the narrower interpretation. That rule, as we have explained on many occasions, serves two vitally important functions:

> "First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.' Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States* v. *Bass*, 404 U. S. 336, 348 (1971) (citations omitted; footnote omitted).

Given the text of the statute and the rule of lenity, I believe that inducement is an element of official extortion under the Hobbs Act.

Perhaps sensing the weakness of its position, the Court suggests an alternative interpretation: even if the statute *does* set forth an "inducement" requirement for official extortion, that requirement is always satisfied, because "the coercive element is provided by the public office itself."

---

defines [official] extortion as 'the obtaining of property from another under color of official right,' or as 'the obtaining of property from another, with his consent, *induced* under color of official right.'. . . [T]he grammatical structure of the Hobbs Act would appear to support the latter language") (emphasis added).

*Ante,* at 266. I disagree. A particular public official, to be sure, may wield his power in such a way as to coerce unlawful payments, even in the absence of any explicit demand or threat. But it ignores reality to assert that *every* public official, in *every* context, automatically exerts coercive influence on others by virtue of his office. If the chairman of General Motors meets with a local court clerk, for example, whatever implicit coercive pressures exist will surely not emanate from the clerk. In *Miranda* v. *Arizona,* 384 U. S: 436 (1966), of course, this Court established a presumption of "inherently compelling pressures" in the context of official custodial interrogation. *Id.,* at 467. Now, apparently, we assume that *all* public officials exude an aura of coercion at *all* places and at *all* times. That is not progress.

## B

The Court's construction of the Hobbs Act is repugnant not only to the basic tenets of criminal justice reflected in the rule of lenity, but also to basic tenets of federalism. Over the past 20 years, the Hobbs Act has served as the engine for a stunning expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws—acts of public corruption by state and local officials. See generally Ruff, Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy, 65 Geo. L. J. 1171 (1977). That expansion was born of a single sentence in a Third Circuit opinion: "[The 'under color of official right' language in the Hobbs Act] repeats the common law definition of extortion, a crime which could only be committed by a public official, and which did not require proof of threat, fear, or duress." *United States* v. *Kenny,* 462 F. 2d 1205, 1229, cert. denied, 409 U. S. 914 (1972). As explained above, that sentence is not necessarily incorrect in its description of what common-law extortion did *not* require; unfortunately, it omits an important part of what common-law extortion *did* require. By over-

looking the traditional meaning of "under color of official right," *Kenny* obliterated the distinction between extortion and bribery, essentially creating a new crime encompassing both.

> "As effectively as if there were federal common law crimes, the court in *Kenny* . . . amend[ed] the Hobbs Act and [brought] into existence a new crime—local bribery affecting interstate commerce. Hereafter, for purposes of Hobbs Act prosecutions, such bribery was to-be called extortion. The federal policing of state corruption had begun." J. Noonan, Bribes 586 (1984).

After *Kenny*, federal prosecutors came to view the Hobbs Act as a license for ferreting out *all* wrongdoing at the state and local level—"'a special code of integrity for public officials.'" *United States* v. *O'Grady*, 742 F. 2d 682, 694 (CA2 1984) (en banc) (quoting letter from Raymond J. Dearie, United States Attorney for the Eastern District of New York, to the United States Court of Appeals for the Second Circuit, dated Jan. 21, 1983). In short order, most other Circuits followed *Kenny*'s lead and upheld, based on a bribery rationale, the Hobbs Act extortion convictions of an astonishing variety of state and local officials, from a State Governor, see *United States* v. *Hall*, 536 F. 2d 313, 320–321 (CA10), cert. denied, 429 U. S. 919 (1976), down to a local policeman, see *United States* v. *Braasch*, 505 F. 2d 139, 151 (CA7 1974), cert. denied, 421 U. S. 910 (1975).

Our precedents, to be sure, suggest that Congress enjoys broad constitutional power to legislate in areas traditionally regulated by the States—power that apparently extends even to the direct regulation of the qualifications, tenure, and conduct of state governmental officials. See, *e. g.*, *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 547–554 (1985). As we emphasized only last Term, however, concerns of federalism require us to give a *narrow* construction to federal legislation in such sensitive areas unless

Congress' contrary intent is "unmistakably clear in the language of the statute." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) (internal quotation marks omitted). "This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.*, at 461. *Gregory's* teaching is straightforward: because we "assume Congress does not exercise lightly" its extraordinary power to regulate state officials, *id.*, at 460, we will construe ambiguous statutory provisions in the least intrusive manner that can reasonably be inferred from the statute, *id.*, at 467.

*Gregory's* rule represents nothing more than a restatement of established law:

> "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. . . . As this Court emphasized only last Term in *Rewis* v. *United States*, [401 U. S. 808 (1971)— a case involving the Hobbs Act's counterpart, the Travel Act], we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States* v. *Bass*, 404 U. S., at 349 (footnote omitted).

Similarly, in *McNally* v. *United States*, 483 U. S. 350 (1987)— a case closely analogous to this one—we rejected the Government's contention that the federal mail fraud statute, 18 U. S. C. § 1341, protected the citizenry's "intangible right" to good government, and hence could be applied to all instances of state and local corruption. Such an expansive reading of

the statute, we noted with disapproval, would "leav[e] its outer boundaries ambiguous and involv[e] the Federal Government in setting standards of disclosure and good government for local and state officials."[7]   Cf. Baxter, Federal Dis-

[7] Prior to our decision in *McNally*, the Government's theory had been accepted by every Court of Appeals to consider the issue. We did not consider that acceptance to cure the ambiguity we perceived in the statutory language; we simply reiterated the traditional learning that a federal criminal statute, particularly as applied to state officials, must be construed narrowly. See 483 U. S., at 359–360. "If Congress desires to go further," we said, "it must speak more clearly than it has." *Id.,* at 360.

The dissent in *McNally* argued strenuously that the Court's interpretation of the statute should be informed by the majority view among the Courts of Appeals and Congress' subsequent silence:

"Perhaps the most distressing aspect of the Court's action today is its casual—almost summary—rejection of the accumulated wisdom of the many distinguished federal judges who have thoughtfully considered and correctly answered the question these cases present. . . . I [can]not join a rejection of such a longstanding, consistent interpretation of a federal statute. See *Commissioner of Internal Revenue* v. *Fink*, 483 U. S. 89, 101 (1987) (STEVENS, J., dissenting); *Citicorp Industrial Credit, Inc.* v. *Brock*, 483 U. S. 27, 40 (1987) (STEVENS, J., dissenting); *Runyon* v. *Mc-Crary*, 427 U. S. 160, 189 (1976) (STEVENS, J., concurring)." *Id.,* at 376–377 (opinion of STEVENS, J.).

The interpretation given a statute by a majority of the Courts of Appeals, of course, is due our most respectful consideration. Ultimately, however, our attention must focus on the *reasons* given for that interpretation. Error is not cured by repetition, and we do not discharge our duty simply by counting up the circuits on either side of the split. Here, the minority position of the Second and Ninth Circuits (both en banc) is far more thoughtfully reasoned than the position of the majority of Circuits, which have followed the Third Circuit's lead in *United States* v. *Kenny,* 462 F. 2d 1205 (1972), "without setting forth a reasoned elaboration for their conclusions." *United States* v. *Cerilli,* 603 F. 2d 415, 427, and n. 5 (CA3 1979) (Aldisert, J., dissenting). Moreover, I reject the notion—as this Court has on many occasions—that Congress, through its silence, implicitly ratifies judicial decisions. See, *e. g., Patterson* v. *McLean Credit Union,* 491 U. S. 164, 175, n. 1 (1989) ("It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional ap-

cretion in the Prosecution of Local Political Corruption, 10 Pepp. L. Rev. 321, 336–343 (1983).

The reader of today's opinion, however, will search in vain for any consideration of the principles of federalism that animated *Gregory, Rewis, Bass,* and *McNally.* It is clear, of course, that the Hobbs Act's proscription of extortion "under color of official right" applies to all public officials, including those at the state and local level. As our cases emphasize, however, even when Congress has clearly decided to engage in *some* regulation of the state governmental officials, concerns of federalism play a vital role in evaluating the *scope* of the regulation.[8] The Court today mocks this jurisprudence by reading two significant limitations (the textual requirement of "inducement" and the common-law requirement of "under color of office") *out* of the Hobbs Act's definition of official extortion.

---

proval" of judicial interpretation of a statute) (internal quotation marks omitted).

I find it unfortunate that the arguments we rejected in *McNally* today become the law of the land. See *ante,* at 268–269 ("Our conclusion is buttressed by the fact that so many other courts that have considered the issue over the last 20 years have interpreted the statute in the same way. Moreover, given the number of appellate court decisions . . . it is obvious that Congress is aware of the prevailing view" and has ratified that view through its silence).

[8] This case is, if anything, more compelling than *Gregory* v. *Ashcroft,* 501 U. S. 452 (1991). In both cases, Congress clearly chose to engage in some regulation of state governmental officials. In *Gregory,* however, that regulation was sweeping on its face, and our task was to construe an *exemption* from that otherwise broad coverage. We decided the case on the ground that the exemption must be *assumed* to include judges unless a contrary intent were manifest. "[I]n this case we are not looking for a plain statement that judges are excluded. We will not read the [statute] to cover state judges unless Congress has made it clear that judges are *included.* . . . [I]t must be plain to anyone reading the Act that it covers judges." *Id.,* at 467. Here, in contrast, our task is to construe the primary scope of the Hobbs Act.

## III

I have no doubt that today's opinion is motivated by noble aims. Political corruption at any level of government is a serious evil, and, from a policy perspective, perhaps one well suited for federal law enforcement. But federal judges are not free to devise new crimes to meet the occasion. Chief Justice Marshall's warning is as timely today as ever: "It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." *United States* v. *Wiltberger*, 5 Wheat., at 96.

Whatever evils today's opinion may redress, in my view, pale beside those it will engender. "Courts must resist th[e] temptation [to stretch criminal statutes] in the interest of the long-range preservation of limited and even-handed government." *United States* v. *Mazzei*, 521 F. 2d 639, 656 (CA3 1975) (en banc) (Gibbons, J., dissenting). All Americans, including public officials, are entitled to protection from prosecutorial abuse. Cf. *Morrison* v. *Olson*, 487 U. S. 654, 727–732 (1988) (SCALIA, J., dissenting). The facts of this case suggest a depressing erosion of that protection.

Petitioner Evans was elected to the Board of Commissioners of DeKalb County, Georgia, in 1982. He was no local tyrant—just one of five part-time commissioners earning an annual salary of approximately $16,000. The board's activities were entirely local, including the quintessentially local activity of zoning property. The United States does not suggest that there were any allegations of corruption or malfeasance against Evans.

In early 1985, as part of an investigation into "allegations of public corruption in the Atlanta area," a Federal Bureau of Investigation agent, Clifford Cormany, Jr., set up a bogus firm, "WDH Developers," and pretended to be a land developer. Cormany sought and obtained a meeting with Evans.

From March 1985 until October 1987, a period of some *two and a half years,* Cormany or one of his associates held 33 conversations with Evans. Every one of these contacts was initiated by the agents. During these conversations, the agents repeatedly requested Evans' assistance in securing a favorable zoning decision, and repeatedly brought up the subject of campaign contributions. Agent Cormany eventually contributed $8,000 to Evans' reelection campaign, and Evans accepted the money. There is no suggestion that he claimed an official entitlement to the payment. Nonetheless, he was arrested and charged with Hobbs Act extortion.

The Court is surely correct that there is sufficient evidence to support the jury's verdict that Evans committed "extortion" under the Court's expansive interpretation of the crime. But that interpretation has no basis in the statute that Congress passed in 1946. If the Court makes up this version of the crime today, who is to say what version it will make up tomorrow when confronted with the next perceived rascal? Until now, the Justice Department, with good reason, has been extremely cautious in advancing the theory that official extortion contains no inducement requirement. *"Until the Supreme Court decides upon the validity of this type of conviction,* prosecutorial discretion should be used to insure that any case which might reach that level of review is worthy of federal prosecution. Such restraint would require that only significant amounts of money and reasonably high levels of office should be involved." See U. S. Dept. of Justice, United States Attorneys' Manual § 9–131.180 (1984) (emphasis added). Having detected no "[s]uch restraint" in this case, I certainly have no reason to expect it in the future.

Our criminal justice system runs on the premise that prosecutors will respect, and courts will enforce, the boundaries on criminal conduct set by the legislature. Where, as here, those boundaries are breached, it becomes impossible to tell where prosecutorial discretion ends and prosecutorial abuse, or even discrimination, begins. The potential for

abuse, of course, is particularly grave in the inherently political context of public corruption prosecutions.

In my view, Evans is plainly innocent of extortion.[9] With all due respect, I am compelled to dissent.

---

[9] Evans also was convicted of filing a false income tax return. He now challenges that conviction on the ground that the jury was given improper instructions. He did not, however, challenge those instructions at trial or in the Court of Appeals. Thus, his current challenge is not properly before this Court. See *Delta Air Lines, Inc.* v. *August,* 450 U. S. 346, 362 (1981); *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 147, n. 2 (1970).